**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 CASES |
| | ) | |
| DIVERSE ENERGY SYSTEMS, LLC | ) | CASE NO. 15-34736 |
| | ) | |
| SCRIBNER INDUSTRIES, INC. | ) | CASE NO. 15-34737 |
| | ) | |
| DIVERSE ENERGY SYSTEMS, LLC | ) | CASE NO. 15-34738 |
| d/b/a LEAN TECHNOLOGIES, LLC | ) | |
| | ) | |
| ROULY, INC. | ) | CASE NO. 15-34739 |
| | ) | |
| Debtors. | ) | **Jointly Administered Under** |
| | ) | **Case No. 15-34736-H5-11** |
| | ) | |

**THIRD SUPPLEMENT TO DEBTORS'
MOTION TO ESTABLISH BID PROCEDURES AND TO SELL
CERTAIN ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO 11 U.S.C § 363 AND TO
ASSUME AND ASSIGN EXECUTORY CONTRACTS AND LEASES AND REQUEST
FOR EMERGENCY HEARING ON BID PROCEDURES (DKT. NO. 178), AS
SUPPLEMENTED AND/OR AMENDED BY DKT. NOS. 189 AND 285, AND AS
<u>MAY BE FURTHER AMENDED OR SUPPLEMENTED</u>**

**TO THE HONORABLE JUDGE OF SAID COURT:**

     **COME NOW**  Diverse Energy Systems, LLC, Diverse Energy Systems, LLC d/b/a Lean

Technologies, LLC, Scribner Industries, Inc., and Rouly, Inc. (collectively, the "**Debtors**"), the

above-captioned debtors and debtors-in-possession, and file this *Third Supplement to Motion to*

*Establish Bid Procedures and to Sell Certain Assets of the Estate Free and Clear of Liens, Claims,*

*Encumbrances and Other Interests Pursuant to 11 U.S.C. § 363 and to Assume and Assign*

*Executory Contracts and Leases (Dkt. No. 178), as Supplemented and/or Amended by Dkt. Nos.*

*189 and 285, and as May be Further Amended or Supplemented* (the "**Supplement**"), and in

support thereof would respectfully show as follows:

1.      Debtors filed its *Motion to Establish Bid Procedures and to Sell Certain Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests Pursuant to 11 U.S.C. § 363 and to Assume and Assign Executory Contracts and Leases* on November 5, 2015 (Dkt. No.178), as supplemented and/or amended by Dkt. Nos. 189 and 285, and as may be further amended or supplemented (collectively the "**Sale Motion**").

2.      Attached hereto as Exhibit "A" is the latest draft of a proposed Asset Purchase Agreement (the "**APA**") by and between Debtors and Cimarron Acquisition Co. ("**Cimarron**") which the Debtors may request that the Court approve at a hearing on the Sale Motion scheduled for Tuesday, January 19, 2016, if Cimarron is the successful bidder.  The attached form of APA is subject to further revision and negotiation by and between Debtors and Cimarron.

3.      For the convenience of the Court and the parties, attached hereto as Exhibit "B" is a redline comparison of the attached APA versus the draft APA by and between Debtors and Cimarron that was circulated to certain creditors and parties-in-interest on December 31, 2015.

Respectfully submitted this 15th day of January, 2016.

Respectfully submitted,

/s/ J. Robert Forshey
J. Robert Forshey
State Bar No. 07264200
Clarke V. Rogers
State Bar No. 24052901
FORSHEY & PROSTOK, L.L.P.
777 Main Street, Suite 1290
Fort Worth, Texas 76102
Phone: (817) 877-8855
Fax: (817) 877-4151
bforshey@forsheyprostok.com
crogers@forsheyprostok.com

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been electronically filed in the case with the Clerk of the United States Bankruptcy Court by using the CM/ECF system, a copy was served on the parties who receive notice via the Court's ECF notification system, and the foregoing document was served via email on the parties listed below on this the 15th day of January, 2016.

Ellen Maresh Hickman
**Office of the U.S. Trustee**
ellen.hickman@usdoj.gov

Thomas G. Wallrich / Joel Nesset
Bryan Patrick Vezey
Cozen O'Connor
twallrich@cozen.com
jnesset@cozen.com
bvezey@cozen.com
Attorneys for **Alerus Financial, N.A.**

Joseph G. Epstein / Sean B. Davis
Winstead PC
jepstein@winstead.com
sbdavis@winstead.com
Attorneys for **Fountain Leasing 2013, LP**

Jim Rea / Marc W. Taubenfeld
McGuire, Craddock & Strother, PC
jrea@mcslaw.com
mtaubenfeld@mcslaw.com
Attorneys for **Grand Bank of Texas**

Michael D. Warner
Cole Schotz P.C.
mwarner@coleschotz.com
Attorneys for **Nations Fund I, LLC**

Michael W. Bishop
Gray Reed & McGraw, P.C.
mbishop@grayreed.com
Attorneys for **ITS Engineered Systems, Inc.**

H. Miles Cohn
Crain, Caton & James, PC
mcohn@craincaton.com
Attorney for the **Official Committee of Unsecured Creditors of ITS Engineered Systems, Inc.**

Cary M. Grossman
Shoreline Capital Advisors, Inc.
cgrossman@shorelinecapitaladvisors.com
**CRO for ITS Engineered Systems, Inc.**

John P. Boylan, CPA
EJC Ventures, LP
jboylan@ejc-ventures.com
**CRO for Debtors**

Matthew D Cavenaugh
Jackson Walker LLP
mcavenaugh@jw.com
Attorneys for **Howard Operating – HEP**

James Scott Douglass
Attorney at Law
jsd@aol.com
Attorney for **James Scott Douglas**

Eric Gould
O'Connor Craig Gould Evans
egoac99@gmail.com
Attorneys for **Icon Bank of Texas, N.A.**

Thomas H Grace
Vorys, Sater, Seymour and Pease LLP
thgrace@vorys.com
Attorneys for **National Oilwell Varco**

Tara L Grundemeier
Linebarger Goggan Blair
houston_bankruptcy@publicans.com
Attorneys for **Cypress Fairbanks ISD and Harris**

County

Dax D Voss
Field Manning et al.
dvoss@lubbocklawfirm.com
Attorneys for **General Steel Warehouse, Inc.**

Patricia Williams Prewitt
Law Office of Patricia Williams Prewitt
pwp@pattiprewittlaw.com
Attorneys for **El Paso, LLC**

Richard M Simses
Cotten Schmidt & Abbott, L.L.P.
rsimses@csa-lawfirm.com
Attorneys for **FMC Technologies Measurement Solutions, Inc.**

Courtney Hull
Office of the Attorney General
bk-chull@texasattorneygeneral.gov
Attorneys for **Texas Comptroller of Public Accounts**

Weldon L. Moore, III
Sussman & Moore, LLP
wmoore@csmlaw.net
Attorneys for **Dominion Transmission, Inc.**

Russell R. Johnson III / John M. Craig
Law Firm of Russell R. Johnson III, PLC
russj4478@aol.com
Attorneys for **Dominion Transmission, Inc.**

James Arthur Collura
Coats Rose
jcollura@coatsrose.com
Attorneys for **Mustang Machinery Company Ltd. dba Mustang Cat**

John F. Higgins, IV
Porter Hedges LLP
jhiggins@porterhedges.com
Attorneys for **Energy Transfer Partners, LP**

Michael S. Holmes
Michael S. Holmes, PC
mshpclaw@gmail.com
Attorneys for **Charles G. Shook**

Mary Elizabeth Kindelt / Gary M. McDonald
McDonald, McCann, Metcalf, and Carwile
mkindelt@mmmsk.com
gmcdonald@mmmsk.com
Attorneys for **Industrial Piping Specialists Inc.**

James F. Kovach
McElvaney & Kovach, LLP
jim@kovachlaw.net
Attorneys for **Flo-Tite**, **New Era Maxtek, Inc.**

George A. Kurisky, Jr.
Johnson DeLuca Kurisky & Gould, PC
gkurisky@jdkklaw.com
Attorneys for **Enterprise FM Trust**

Daniel J. Lowenberg
Fleming & Lowenberg
dlowenberg@mountainlawgroup.com
Attorneys for **Brandon Plumb**

James Matthew Schober
Schober & Schober, PC
jim@schoberlegal.com
Attorneys for **Coyote Capital Management, LLC**

Nicholas Zugaro / Eric M. Van Horn
Amber M. chambers
McCathern, PLLC
nzugaro@mccathernlaw.com
ericvanhorn@mccathernlaw.com
achambers@mccathernlaw.com

Spencer D. Solomon
Nathan Sommers Jacobs PC
ssolomon@nathansommers.com
Attorneys for **Twin Stars Compression, LLC**

Attorneys for **Spunky Flat Land Company**, **FWT Leasing Company**, **Charles G. Shook**, and **Client Growth Specialists, Inc.**

Dustin L. Perry
Steven W. Soule
Hall, Estill, Hardwick, et al.
dperry@hallestill.com
ssoule@hallestill.com
Attorneys for **J.W. Williams, Inc.**

Patrick L. Hughes
Karl D. Burrer
Haynes and Boone, LLP
patrick.hughes@haynesboone.com
karl.burrer@haynesboone.com
Attorneys for **Chiron Financial Group, Inc. and SSG Advisors, LLC**

Floyd R. Hartley, Jr.
Allred Wilcox & Hartley PLLC
frhartley@awh-pllc.com
Attorneys for **Lendteq, LLC**

Kate H. Easterling
Joseph E. Bain
Edison McDowell & Hetherington LLP
kate.easterling@emhllp.com
joe.bain@emhllp.com
Attorneys for **Lendteq, LLC**

/s/ J. Robert Forshey
J. Robert Forshey

# EXHIBIT "A"

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**DIVERSE ENERGY SYSTEMS, LLC,**

**DIVERSE ENERGY SYSTEMS, LLC, D/B/A LEAN TECHNOLOGIES, LLC,**

**SCRIBNER INDUSTRIES, INC.,**

**ROULY, INC.,**

**ITS ENGINEERED SYSTEMS, INC.,**

**AND**

**CIMARRON ACQUISITION CO.**

**EFFECTIVE AS OF JANUARY [•], 2016**

# TABLE OF CONTENTS

**Page**

ARTICLE I.        - ACQUIRED ASSETS ...................................................................... 3

    Section 1.1     Acquired Assets ............................................................... 3

    Section 1.2     Diverse Assets ................................................................ 3

    Section 1.3     ITS Assets ...................................................................... 4

    Section 1.4     Rouly Assets ................................................................... 5

    Section 1.5     Other Acquired Assets .................................................... 6

    Section 1.6     Excluded Assets ............................................................. 6

    Section 1.7     Assumed Liabilities ........................................................ 7

    Section 1.8     Excluded Liabilities ........................................................ 8

    Section 1.9     Identification of Additional Excluded Assets ................... 9

    Section 1.10    Permitted Encumbrances ................................................ 9

ARTICLE II.       - PURCHASE PRICE AND CLOSING ............................................. 10

    Section 2.1     Purchase Price ............................................................. 10

    Section 2.2     Liability for Taxes ......................................................... 10

    Section 2.3     Cure Costs .................................................................... 10

    Section 2.4     Deposit ......................................................................... 10

    Section 2.5     Closing .......................................................................... 10

    Section 2.6     Further Assurance; Post-Closing Cooperation ............. 12

    Section 2.7     Allocation of Purchase Price ........................................ 13

ARTICLE III.      - REPRESENTATIONS AND WARRANTIES OF SELLERS ............ 13

    Section 3.1     Due Organization and Good Standing ........................... 13

    Section 3.2     Authorization; Enforceability ........................................ 13

    Section 3.3     Financial Statements .................................................... 14

    Section 3.4     Litigation ....................................................................... 14

    Section 3.5     Title to Acquired Assets; Sufficiency ........................... 14

    Section 3.6     Tax Matters ................................................................... 14

    Section 3.7     Intellectual Property ..................................................... 14

    Section 3.8     Employee Benefits/Labor .............................................. 15

    Section 3.9     Environmental and Health and Safety Matters ............. 15

    Section 3.10    Compliance with Laws; Permits ................................... 16

- i -

# TABLE OF CONTENTS
(continued)

**Page**

Section 3.11 Major Customers .................................................................. 16

Section 3.12 Major Suppliers ................................................................... 16

Section 3.13 Contracts ............................................................................ 16

Section 3.14 Real Property ...................................................................... 16

Section 3.15 Financial Advisors ............................................................... 17

Section 3.16 Condition of Acquired Assets ............................................... 17

ARTICLE IV.  - REPRESENTATIONS AND WARRANTIES OF PURCHASER ...... 18

Section 4.1 Organization and Good Standing ........................................... 18

Section 4.2 Authorization of Agreement ................................................... 18

Section 4.3 Non-Contravention; Consents ................................................ 18

Section 4.4 Financial Advisors ................................................................. 18

ARTICLE V.  - COVENANTS ...................................................................... 19

Section 5.1 Mutual Cooperation .............................................................. 19

Section 5.2 Notification of Certain Matters ............................................... 19

Section 5.3 Conduct of Sellers Prior to Closing ........................................ 19

Section 5.4 Allocation of Expenses .......................................................... 20

Section 5.5 Access and Investigation ....................................................... 20

ARTICLE VI.  - CONDITIONS TO CLOSING ................................................. 21

Section 6.1 Conditions to Obligations of Purchaser ................................... 21

Section 6.2 Conditions to Obligations of Sellers ....................................... 22

ARTICLE VII.  - OTHER AGREEMENTS ...................................................... 23

Section 7.1 Employees ............................................................................ 23

Section 7.2 Casualty and Insurance ......................................................... 23

Section 7.3 Reservation of Rights Amongst Sellers Regarding
Certain Asset Ownership .......................................................................... 23

Section 7.4 Release ................................................................................ 23

ARTICLE VIII.  - BANKRUPTCY .................................................................. 24

Section 8.1 Bankruptcy Court Approval .................................................... 24

Section 8.2 Commercially Reasonable Efforts ........................................... 24

Section 8.3 Bankruptcy Sale Orders ......................................................... 24

- ii -

# TABLE OF CONTENTS
(continued)

Page

ARTICLE IX.        - TERMINATION...................................................................... 24

    Section 9.1      Termination Events............................................... 24

    Section 9.2      Effect of Termination ........................................... 25

ARTICLE X.        - MISCELLANEOUS ......................................................... 25

    Section 10.1     Governing Law, Jurisdiction.................................. 25

    Section 10.2     JURY TRIAL WAIVER ......................................... 26

    Section 10.3     Notices.................................................................. 26

    Section 10.4     Assignment .......................................................... 27

    Section 10.5     Severability .......................................................... 27

    Section 10.6     Counterparts ........................................................ 27

    Section 10.7     Entire Agreement; Amendments and Waivers ....... 28

ARTICLE XI.       - DEFINED TERMS ......................................................... 28

    Section 11.1     Certain Definitions ................................................ 28

    Section 11.2     Terms Defined Elsewhere in this Agreement.......... 32

    Section 11.3     Other Definitional and Interpretive Matters ............ 34

- iii -

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is entered into effective as of January [●], 2016, by and among Diverse Energy Systems, LLC , a Texas limited liability company ("Diverse Texas"), Diverse Energy Systems, LLC, d/b/a Lean Technologies, LLC, a North Dakota limited liability company ("Diverse"), Scribner Industries, Inc., a Texas corporation ("Scribner"), Rouly, Inc., a New Mexico corporation ("Rouly"), ITS Engineered Systems, Inc., a Delaware corporation ("ITS"), and Cimarron Acquisition Co., a Delaware corporation ("Purchaser"). Diverse Texas, Diverse, Scribner, Rouly, and ITS are each referred to herein as a "Seller," and collectively as "Sellers." Sellers and Purchaser are sometimes hereinafter collectively referred to as the "Parties" and individually as a "Party."

## RECITALS

A.      Sellers are in the business of fabricating, distributing and marketing various oilfield equipment (the "Business").  Sellers wish to sell, and Purchaser wishes to purchase, certain of the assets of Sellers upon the terms and subject to the conditions set forth in this Agreement.

B.      On April 17, 2015, ITS filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. sections 101 *et seq.* ("Bankruptcy Code"), commencing Case No. 15-32145 ("ITS Case") in the United States Bankruptcy Court for the Southern District of Texas ("Bankruptcy Court").

C.      On September 7, 2015, the following entities (sometimes hereinafter collectively referred to as the "Diverse Debtors"), each filed voluntary petitions for relief pursuant to the Bankruptcy Code in the Bankruptcy Court commencing the following bankruptcy cases (collectively the "Diverse Cases"):

> (i)      Diverse Texas, Case no. 15-34736;
>
> (ii)     Scribner, Case no. 15-34736;
>
> (iii)    Diverse, Case no. 15-34738; and
>
> (iv)    Rouly, Case no. 15-34739.

The Diverse Cases have been administratively consolidated under the Diverse Texas case.

D.      Sellers all continue to operate as debtors and debtors-in-possession pursuant to Chapter 11 of the Bankruptcy Code.  Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to acquire from Sellers, pursuant to Section 363 of the Bankruptcy Code, the Acquired Assets (as defined below), all at the price, and on the terms and conditions, as more specifically provided in this Agreement. The Acquired

Assets will be transferred to Purchaser free and clear of all Liens, claims and interests except as expressly set forth herein.

E.      Each Seller has determined that it is advisable and in the best interests of its estate and the beneficiaries of its estate to seek approval of this transaction from the Bankruptcy Court and to consummate the transactions provided for herein.

F.      Both ITS and the Diverse Debtors have obtained approval from the Bankruptcy Court of a joint sale procedure. On November 19, 2015, the Bankruptcy Court entered in the ITS Case an *Order Granting Debtor's Motion to Establish Bid Procedures and to Sell Certain Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests Pursuant to 11 U.S.C. § 363 and to Assume and Assign Executory Contracts and Leases (Dkt. No. 259)* as supplemented by docket no. 281 ("ITS Sales Procedures Order") approving a sales procedure for the assets of ITS. On the same day, the Bankruptcy Court entered in the Diverse Cases an *Order Granting Debtors' Motion to Establish Bid Procedures and to Sell Certain Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests Pursuant to 11 U.S.C. § 363 and to Assume and Assign Executory Contracts and Leases (Dkt. No. 212)* as supplemented by docket no. 265 ("Diverse Sales Procedures Order") approving a sales procedure for the assets of Diverse and Rouly. The ITS Sales Procedure Order and the Diverse Sales Procedures Order dovetail and provide for a sale of the assets of ITS, Diverse and Rouly as a part of a single sales procedure. This Agreement is executed in accordance with the ITS Sales Procedure Order and Diverse Sales Procedures Order.

G.      National Oil Well Varco, L.P. ("NOV") is a secured lender to the Diverse Debtors.  Purchaser has reached agreement with NOV that, contemporaneously with the Closing, Purchaser will acquire any claims that NOV has to equipment that is held by the Diverse Debtors and claims of NOV against Sellers.

H.      Fountain Leasing 2013 LP ("Fountain") is a secured lessor to the Diverse Debtors.  Purchaser has reached agreement with Fountain that, contemporaneously with the Closing, Purchaser will acquire from Fountain the equipment that Fountain currently leases to the Diverse Debtors, and as a result the Diverse Debtors will reject the Master Lease Agreement, dated February 12, 2014, between Diverse and Fountain, along with any schedules or other Contracts relating thereto.

I.      Nations Fund I, LLC ("Nations") is a secured lessor to the Diverse Debtors. Purchaser has reached agreement with Nations that, immediately prior to the Closing, the parties will amend and restate (the "Amended and Restated Agreement") the Master Lease Agreement (and any schedules thereunder), dated December 29, 2014, between Diverse and Nations.  The Amended and Restated Agreement will become effective at the Closing, and will be assigned to and assumed by Purchaser.

J.      Grand Bank of Texas ("Grand") is a secured lessor to the Diverse Debtors. Purchaser has reached agreement with Grand that, contemporaneously with the Closing, Purchaser will acquire from Grand the equipment that Grand currently leases, indirectly through Integral Equipment Leasing, LLC, to the Diverse Debtors, and as a result the

- 2 -

Diverse Debtors will reject the Master Lease Agreement, between Diverse and Integral Equipment Leasing, LLC, along with any schedules or other Contracts relating thereto.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

## ARTICLE I. - ACQUIRED ASSETS

**Section 1.1** **Acquired Assets**.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will (or will cause one of its designated affiliates to) purchase and acquire from Sellers, and Sellers will sell, transfer, convey, assign and deliver ("Convey") to Purchaser (or its designated affiliate), all of Sellers' right, title and interest in, to and under the Acquired Assets, free and clear of all Liens other than Permitted Encumbrances.  The term "Acquired Assets" means all of the Sellers' business, assets, properties, contractual rights, goodwill, going concern value, rights and claims used or held for use in their respective business (other than Excluded Assets), including the Diverse Acquired Assets, ITS Acquired Assets and Rouly Acquired Assets.  For the avoidance of doubt, while specific assets of Diverse, ITS and Rouly are itemized below, (a) such listing is not exclusive and is for illustrative purposes only and (b) all Acquired Assets held by Diverse Texas, Scribner, ITS Water and Acquisition Financing Group, if any, will also be Conveyed to Purchaser (or its designated affiliate) at the Closing.  For the avoidance of doubt, Sellers will not be deemed to have transferred any assets that are not otherwise owned by Sellers, including any property owned by third parties and held by Sellers pursuant to a bailment or consignment arrangement (although control of such assets will transfer to Purchaser for disposition pursuant to such arrangement).

**Section 1.2** **Diverse Assets**.  On the terms and subject to the conditions set forth in this Agreement, Diverse will Convey to Purchaser (or its designated affiliate), and Purchaser (or its designated affiliate) will purchase, all of Diverse' s right, title and interest in and to all of the assets, properties and rights of Diverse (collectively the "Diverse Acquired Assets"), other than Excluded Assets, free and clear of all mortgages, liens, security interests, encumbrances, claims, pledges, deeds of trust, leases, options, rights of first refusal, easements, transfer restrictions, charges and restrictions of any kind or character ("Liens"), except for the Permitted Encumbrances, including the following Diverse Acquired Assets:

(a)     Equipment.  All equipment (collectively the "Diverse Equipment"), including all spare and replacement parts, and all warranties from any manufacturer, described in the attached Schedule 1.2(a);

(b)     Inventory.  All Inventory (collectively the "Diverse Inventory"), including Inventory described in the attached Schedule 1.2(b);

- 3 -

(c)     <u>Rental Equipment</u>.  All rental equipment, including as described in the attached Schedule 1.2(c), which is leased to third parties or held by Diverse for that purpose (collectively the "<u>Rental Equipment</u>");

(d)     <u>Real Estate</u>.  All real property interests in the land ("<u>Diverse Real Estate</u>") described in the attached Schedule 1.2(d);

(e)     <u>Furniture/Fixtures</u>.  All furniture and fixtures (collectively the "<u>Diverse Furniture</u>"), including as described in the attached Schedule 1.2(e);

(f)     <u>Contracts</u>.  The Contracts ("<u>Purchased Contracts</u>") to the extent expressly identified in the attached Schedule 1.2(f), including any Master Service Agreements and customer accounts listed therein, and any contracts of ITS and any other Diverse Debtor, in each case to the extent not rejected by Sellers or designated as Excluded Assets by Purchaser pursuant to <u>Section 1.9</u>;

(g)     <u>Real Estate Lease Agreements</u>.  The real estate leases ("<u>Diverse Real Estate Leases</u>") described in the attached Schedule 1.2(g), in each case to the extent not rejected by Seller or designated as Excluded Assets by Purchaser pursuant to <u>Section 1.9</u>;

(h)     <u>Equipment Leases</u>.  Diverse's rights pursuant to equipment leases ("<u>Equipment Leases</u>") described in the attached Schedule 1.2(h), including any Master Equipment Leases in which Diverse is the lessee, in each case to the extent not rejected by Seller or designated as Excluded Assets by Purchaser pursuant to <u>Section 1.9</u>;

(i)     <u>Intellectual Property</u>.  All Intellectual Property ("<u>Diverse Intellectual Property</u>"), including as described in the attached Schedule 1.2(i), which includes all names, trademarks, licenses, software licenses and other intellectual property, including without limitation all proprietary designs and manufacturing techniques and all other proprietary knowledge; and

(j)     <u>Accounts</u>.   All Accounts (collectively the "<u>Diverse Accounts</u>"), including those described in the attached Schedule 1.2(j), excluding any Accounts owed by ITS or any of the Diverse Debtors).

**Section 1.3     <u>ITS Assets</u>**. On the terms and subject to the conditions set forth in this Agreement, ITS will Convey to Purchaser (or its designated affiliate), and Purchaser (or its designated affiliate) will purchase, all of ITS's right, title and interest in and to all of the assets, properties and rights of ITS (collectively the "<u>ITS Acquired Assets</u>"), other than Excluded Assets, free and clear of all Liens, except for the Permitted Encumbrances, including the following ITS Acquired Assets:

(a)     <u>Equipment</u>.  All equipment (collectively the "<u>ITS Equipment</u>"), including all spare and replacement parts, and all warranties of any manufacturers, described in the attached Schedule 1.3(a);

- 4 -

(b)     Inventory.  All Inventory (collectively the "ITS Inventory"), including Inventory described in the attached Schedule 1.3(b);

(c)     WIP.  The WIP (collectively the "ITS WIP") described in the attached Schedule 1.3(c);

(d)     Furniture/Fixtures.  All furniture and fixtures (collectively the "ITS Furniture"), including as described in the attached Schedule 1.3(d);

(e)     Intellectual Property.  All Intellectual Property ("ITS Intellectual Property"), including as described in the attached Schedule 1.3(e), which includes all names, trademarks, licenses, software licenses and other intellectual property, including without limitation all proprietary designs and manufacturing techniques and all other proprietary knowledge;

(f)     ITS Options.  Any option held by ITS to acquire any real or personal property ("ITS Option Rights"), including as described in the attached Schedule 1.3(f); and

(g)     Accounts.  All Accounts (collectively the "ITS Accounts"), including those described in the attached Schedule 1.3(g), but excluding any Accounts owing by the Diverse Debtors to ITS.

**Section 1.4     Rouly Assets**.  On the terms and subject to the conditions set forth in this Agreement, Rouly will Convey to Purchaser (or its designated affiliate), and Purchaser (or its designated affiliate) will purchase, all of Rouly's right, title and interest in and to all of the assets, properties and rights of Rouly (collectively the "Rouly Acquired Assets"), other than Excluded Assets, free and clear of all Liens, except for the Permitted Encumbrances, including the following Rouly Acquired Assets:

(a)     Equipment.  All equipment (collectively the "Rouly Equipment"), including all spare and replacement parts, and all warranties of any manufacturers, described in the attached Schedule 1.4(a);

(b)     Inventory.  All Inventory (collectively the "Rouly Inventory"), including Inventory described in the attached Schedule 1.4(b);

(c)     Furniture/Fixtures.  All furniture and fixtures (collectively the "Rouly Furniture"), including as described in the attached Schedule 1.4(c);

(d)     Real Estate.  All real property interests in the land ("Rouly Real Estate") described in the attached Schedule 1.4(d);[1]

(e)     Intellectual Property.  All Intellectual Property ("Rouly Intellectual Property"), including as described in the attached Schedule 1.4(e), which includes all

---

[1]     **Note to Draft:**  Purchaser is willing to transfer the Hobbs, New Mexico property to Alerus Financial, N.A., following the Closing for a nominal amount.

names, trademarks, licenses, software licenses and other intellectual property, including all proprietary designs and manufacturing techniques and all proprietary knowledge; and

(f)    Real Estate Lease Agreements.  The real estate leases ("Rouly Real Estate Leases") described in the attached Schedule 1.4(f), in each case to the extent not rejected by Seller or designated as Excluded Assets by Purchaser pursuant to Section 1.9;

**Section 1.5    Other Acquired Assets**.  Acquired Assets will also include any of the following held by or on behalf of a Seller (to the extent not Excluded Assets):[2]

(a)    Deposits.  All deposits (including Customer Deposits and security deposits for rent, electricity, telephone or otherwise) and prepaid charges and expenses of Sellers related to the Business, in each case to the extent assignable to Purchaser ("Deposits");

(b)    Employee Benefits.  All deposits, in trust or otherwise, with respect to any employee benefit plan, including any 401(k) plan;

(c)    Books and Records.  All documents and books and records, of the Business, including relating to products, services, marketing, advertising, personnel files for Transferred Employees and all files, customer files, supplier lists, records, literature and correspondence ("Books and Records"); and

(d)    Causes of Action.  Unless otherwise expressly set forth in this Agreement, all rights, claims or causes of action of Sellers against third parties relating to the Acquired Assets or Assumed Liabilities (other than Avoidance Actions), including those arising out of events occurring prior to the Closing Date and claims against any (i) customer of the Business, (ii) any vendor or supplier  of the Business, or (iii) any Transferred Employee; provided, however, this paragraph (e) does not apply to any Avoidance Actions.

**Section 1.6    Excluded Assets**.  Nothing contained in this Agreement will be deemed to constitute an agreement to Convey the Excluded Assets to Purchaser, and Sellers will retain all right, title and interest to, in and under the Excluded Assets. The term "Excluded Assets" means:

(a)    cash, cash equivalents, cash proceeds, and all funds held in any bank or deposit account of a Seller as of the Business Day prior to the Closing Date;

(b)    taxpayer and other identification numbers, minute books, stock transfer books, stock certificates, stock records, and other documents relating to the organization maintenance, and existence of Sellers;

---

[2]    **Note to Draft:**  Parties to discuss treatment of Bank Accounts that customers pay directly to as this will continue following the Closing.  Any amounts paid to such accounts are property of Purchaser; it will be simpler to transfer ownership of such accounts to Purchaser.

(c)      Avoidance Actions;

(d)      any Contracts, except for the Purchased Contracts;

(e)      taxpayer or other similar identification numbers of Sellers;

(f)      any equity interests in any Person, including any Seller or ITS Water or AFG;

(g)      any claim, right, or interest of Sellers in or to any refund, rebate, abatement, or other recovery for Taxes for periods 2014 and prior;

(h)      Sellers' rights under any insurance policies or rights to proceeds thereof;

(i)      any indebtedness (including, any Accounts) owed by one Seller to any of the other Sellers or any related entity;

(j)      any claim by one Seller against any of the other Sellers or their respective affiliates;

(k)      the items specifically set forth on Schedule 1.5(k);[3]

(l)      all claims or causes of action against Spunky Flat Land Company, FWT Leasing Company, Charles Shook, Sloan & Moyer and ITS (US) Holdings, Inc., and other third parties other than any (i) customer of the Business, (ii) vendor or supplier of the Business, or (iii) Transferred Employee; provided, however, this paragraph (k) does not apply to any Avoidance Actions; and

(m)      all malpractice or similar claims by any Seller against any professionals, including all legal malpractice claims.  Without limiting the generality of the foregoing, this shall include without limitation all malpractice claims by any Seller against David Sloan and the firm of Sloan & Moyer, Houston, Texas.

Section 1.7      **Assumed Liabilities.**      Except for Assumed Liabilities, which obligations shall be assumed by Purchaser at Closing, Purchaser (and any of its affiliates) shall not assume by virtue of this Agreement or the transactions contemplated hereby, and shall have no liability for, any liabilities of any Seller.  "Assumed Liabilties" will mean only the following liabilities of Sellers:

(a)      Customer Deposits to the extent expressly identified on Schedule 1.7;

---

[3]      **Note to Draft:** Schedule to list Odessa lease, Titan equipment, Katy facility lease agreement, FWT equipment (and related lease agreement), New Mexico real property lease, Fountain equipment (and related lease agreement) and Grand Bank / Integral equipment (and related lease agreement) (Fountain and Grand Bank / Integral equipment will be purchased directly from such parties).

(b)     all due and owing accounts payable that were incurred by Sellers in the ordinary course of business subsequent to the filing of their respective bankruptcy cases through the date prior to the Closing Date to the extent expressly identified on Schedule 1.7, not to exceed the aggregate cap amount set forth on Schedule 1.7;

(c)     all Transfer Taxes with respect to Acquired Assets that may be owing to any Governmental Body arising or relating to the transactions contemplated by this Agreement;

(d)     all obligations under each of the Purchased Contracts to the extent arising out of post-Closing obligations;

(e)     the Cure Costs with respect to Purchased Contracts;

(f)     all property taxes assessed against the Acquired Assets for the tax years 2015 and 2016 to the extent expressly identified on Schedule 1.7, not to exceed the aggregate cap amount set forth on Schedule 1.7;

(g)     all accrued and unpaid salaries and salary related taxes, benefits, accrued commissions, and expense reimbursables as of the Closing for all of the Transferred Employees to the extent expressly identified on Schedule 1.7, not to exceed the aggregate cap amount set forth on Schedule 1.7;

(h)     sales taxes owing to any governmental entity for any period prior to the filing of Sellers' respective bankruptcy petitions to the extent expressly identified on Schedule 1.7, not to exceed the aggregate cap amount set forth on Schedule 1.7;

(i)     amounts that may be owing to Ally to the extent expressly identified on Schedule 1.7, not to exceed the aggregate cap amount set forth on Schedule 1.7; and

(j)     all sales taxes owing to any governmental entity collected by Purchaser subsequent to the Closing, as part of accounts receivable collections with respect to Acquired Assets.

**Section 1.8     Excluded Liabilities**.  Purchaser will not assume and will be deemed not to have assumed, and Sellers will remain liable with respect to, any liabilities of Sellers other than the Assumed Liabilities (such other liabilities, the "Excluded Liabilities"), including:

(a)     all liabilities arising out of Excluded Assets;

(b)     all liabilities of any Seller arising under this Agreement; and

(c)     any liability arising out of or related to the Acquired Assets or the Business related to facts or actions occurring or accruing prior to the Closing that is not expressly included among the Assumed Liabilities.

- 8 -

**Section 1.9     Identification of Additional Excluded Assets**.   Notwithstanding anything in this Agreement to the contrary, at any time prior to the date that is 30 days following the Closing Date, Purchaser will be entitled, in its sole discretion, to designate any Acquired Asset, including any Purchased Contract, as an Excluded Asset, by providing written notice thereof to Sellers.   Sellers acknowledge and agree that Purchaser and its affiliates will not be responsible for or otherwise assume or have any obligation for any liabilities associated with or related to or arising under any such asset, including any such Contract, designated as an additional Excluded Asset in accordance with the foregoing. Without any further action on the part of Sellers or their respective successors, the transfer of such Acquired Assets (and assumption of any related liabilities with respect thereto) will be deemed null and void ab initio and Sellers will be deemed to have retained all liabilities with respect thereto.[4]   In the event Purchaser timely designates any Acquired Asset or Purchased Contract as an Excluded Asset pursuant to the terms of this Section 1.9, such designation does not change the Purchase Price owing by Purchaser or liability of Purchaser with respect to any Assumed Liability described in clauses (a), (b), (c) or (f) – (j) of the definition of "Assumed Liabilities."

**Section 1.10   Permitted Encumbrances**.   The following shall constitute permitted encumbrances (collectively the "Permitted Encumbrances") to the sale of the Acquired Assets:

(a)     property Taxes assessed against the Acquired Assets for tax years 2015 and 2016;[5]

(b)     as to the Diverse Real Estate, the matters set forth in the attached Schedule 1.10(c) and other matters filed in the real property records relating to the Diverse Real Estate; and

(c)     as to the Rouly Real Estate, the matters set forth in the attached Schedule 1.10(d) and other matters filed in the real property records relating to the Rouly Real Estate.

**Section 1.11   Condition of Acquired Assets**. The Acquired Assets are all sold and transferred by Sellers to Purchaser "AS IS, WHERE IS," "WITH ALL FAULTS." Sellers make no warranty, either express or implied, as to the Acquired Assets, including without limitation any warranty of merchantability or fitness for any particular purpose of any of the Acquired Assets, and all such warranties are hereby expressly disclaimed and negated except for the warranties in Article III. In purchasing the Acquired Assets, Purchaser hereby acknowledges to, and represents and warrants to, Sellers, that in purchasing the Acquired Assets pursuant to this Agreement: (a) Purchaser is solely and exclusively relying upon its own due diligence, inspection and assessment of the Acquired Assets; (b) Purchaser is not relying upon any statement, representation or warranty of Sellers, except as expressly set forth herein; and (c) Purchaser acknowledges that, the

---

[5]   **Note to Draft:**  Equipment purchased from Titan and financed by CNH Capital will remain with the estate.

acknowledgements and representations contained in this Section 1.11 are a material inducement for Sellers to enter into this Agreement and that Sellers would not have entered into this Agreement but for such acknowledgements and warranties.

Section 1.12 **Real Estate Warranties of Title**. Purchaser shall receive a special warranty of title as to any real estate included in the Acquired Assets warranting title against claims by, through and under such Seller, but not otherwise.

Section 1.13 **Assets of AFG and ITS Water**. Prior to the Closing, Sellers will and will cause each of AFG and ITS Water to transfer any and all assets held by AFG or ITS Water, other than equity in any entity and cash or funds in any financial institution, to a Seller so that such assets are included as Acquired Assets as applicable.

## ARTICLE II. - PURCHASE PRICE AND CLOSING

Section 2.1 **Purchase Price**. The aggregate consideration for the Acquired Assets will be equal to the assumption of the Assumed Liabilities plus an amount in cash equal to $5,450,000 (the "Purchase Price"), and the Purchase Price less the Trust Deposit will be paid on the Closing Date to the account(s) designated by Sellers in writing to Purchaser at least two Business Days prior to Closing.

Section 2.2 **Liability for Taxes.** Purchaser shall pay all property taxes assessed against the Acquired Assets for the tax years 2015 and 2016.

Section 2.3 **Cure Costs.** Purchaser will pay to the appropriate Persons all amounts necessary to cure defaults under the Purchased Contracts, to the extent ultimately assigned to Purchaser and not otherwise rejected under Section 1.9, so as to permit the assumption and assignment of the Purchased Contracts pursuant to Section 365 of the Bankruptcy Code ("Cure Costs").

Section 2.4 **Deposit**. Prior to the execution hereof, Purchaser has deposited the sum of two hundred fifty thousand and No/100 dollars ($250,000) into a trust account designated by Sellers as trust deposit (the "Trust Deposit"), to be credited to the Purchase Price at Closing. Any interest on the Trust Deposit shall become part of the trust fund.

Section 2.5 **Closing**. The closing of the purchase and sale (the "Closing") provided for in this Agreement shall take place in accordance with the following terms:

(a) **Time of Closing**. The Closing shall take place five Business Days following satisfaction or waiver of the conditions set forth in Article VI (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other time and place as the Parties may agree in writing (the date on which the Closing occurs, the "Closing Date"). At the Closing, Sellers shall Convey and surrender to Purchaser all of the Acquired Assets and Purchaser shall pay Sellers or Sellers' designee(s) the Purchase Price by wire transfer in immediately available funds to a United States account(s), which shall be designated in writing by Sellers to Purchaser no later than three Business Days prior to the Closing Date. Unless

- 10 -

otherwise agreed to by the Parties and the DIP lender, in no event shall the Closing Date occur after January 29, 2016.

(b)     Location of Closing. The Closing contemplated by this Agreement will take place at the offices of Jones Day located at 2727 N. Harwood Street, Dallas, TX 75201.

(c)     Deliveries by Sellers. At the Closing, Sellers will deliver, or cause to be delivered, to Purchaser:

(i)      one or more duly executed bills of sale in a form to be agreed upon by the Parties;

(ii)     one or more duly executed assignment and assumption agreements in a form to be agreed upon by the Parties;

(iii)    the officer's certificate required to be delivered pursuant to Section 6.1(b);

(iv)    affidavits executed by each Seller that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(v)     certified copies of the Bankruptcy Sale Orders;

(vi)    physical possession of all of the Acquired Assets;

(vii)   one or more special warranty deeds, in the form to be agreed upon by the Parties, executed and acknowledged by the applicable Seller;

(viii)  assignment to Purchaser or its designee of the personal guarantees that were issued to Alerus Financial, NA, or its affiliate, by Todd A. Hass and H. Roger Wagner, in a form to be agreed upon by the parties thereto;

(ix)    employment, consulting and/or noncompete agreements between the Persons set forth on Schedule 2.5(c)(ix) and Purchaser, in form and substance satisfactory to Purchaser;

(x)     certificates of titles for any vehicles or titled equipment included in the Acquired Assets, free and clear of Liens, duly endorsed by the applicable Seller; and

(xi)    such bills of sale, special warranty deeds, endorsements, assignments, UCC terminations and other filings and other good and sufficient instruments, in form reasonably satisfactory to Purchaser, as Purchaser may reasonably

- 11 -

request to vest in Purchaser all the right, title and interest of Sellers in, to or under any or all of the Acquired Assets free and clear of Liens other than Permitted Encumbrances.

(d)     Deliveries by Purchaser.  At the Closing, Purchaser will deliver, or cause to be delivered, to Sellers:

(i)     the cash payment in accordance with Section 2.1;

(ii)    countersignature to one or more duly executed assignment and assumption agreements in a form to be agreed upon by the Parties;

(iii)   the officer's certificate required to be delivered pursuant to Section 6.2(a); and

(iv)    such assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to transfer and assign the Acquired Assets and Assumed Liabilities to Purchaser.

(e)     Removal of Acquired Assets.  If Purchaser is not acquiring or leasing the real estate on which any Acquired Assets are located, then Purchaser shall have a period of 60 days from the Closing Date to remove such Acquired Assets; provided, that Sellers shall have no responsibility for any of the Acquired Assets following the Closing. The removal of such Acquired Assets shall be at Purchaser's sole cost and risk.

Section 2.6     Further Assurance; Post-Closing Cooperation.  The Parties agree, at and after the Closing, (a) to furnish upon request to each other such further information as may be reasonably necessary or appropriate, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other Parties may reasonably request for the purpose of carrying out the intent of this Agreement and fully consummating and performing the transactions contemplated herein. In addition, for a period of 90 days after the Closing, Sellers shall be entitled to reasonable assistance from Diverse's accounting staff that are Transferred Employees to assist in the wind-up of Sellers' accounting and business.  Sellers shall reimburse Purchaser for the services of such accounting personnel based on a reasonable hourly rate directly tied to the compensation paid to such members of the accounting staff by Purchaser.  Additionally, for a period of two years following the Closing, Sellers, their professionals, and other authorized representatives of the bankruptcy estate shall have access to the Books and Records during normal business hours and upon reasonable notice to Purchaser and without interference with Purchaser's business, to obtain information to allow Sellers to windup their respective affairs and to administer their respective bankruptcy estates.

Section 2.7     Allocation of Purchase Price. Purchaser and Sellers shall mutually agree to the allocation, prepared in accordance with Section 1060 of the Code and the

- 12 -

Treasury Regulations thereunder, of the Purchase Price among the Acquired Assets. Purchaser and Sellers shall use the asset values allocation mutually determined by Purchaser and Sellers for purposes of all tax returns. Sellers and Purchaser shall cooperate in the preparation and filing of any necessary tax forms and tax returns to ensure consistency with the allocation provided in this Agreement; provided, however, the allocation for Tax purposes shall not be binding upon Purchaser or any of Sellers' respective bankruptcy estates or any secured creditor holding or claiming a Lien against any of the Acquired Assets. For removal of any doubt, the allocation of the Purchase Price shall not be binding upon Sellers in determining the manner in which the Purchase Price is to be allocated as among the ITS and Diverse Debtors' respective bankruptcy estates or the manner in which the Purchase Price will be allocated to the secured claim of any secured creditor. This allocation, as among Sellers' various bankruptcy estates or with respect to the secured claim of any secured creditors, shall be established by the Bankruptcy Court as a part of the ITS Case and the Diverse Cases.

## ARTICLE III.- REPRESENTATIONS AND WARRANTIES OF SELLERS

The representations and warranties set forth in this Article III are made to Purchaser by each Seller relating to their respective entities, on a several and not a joint basis, as follows:

**Section 3.1    Due Organization and Good Standing**.  Each Seller is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its organization, subject to the limitations imposed on such Seller as a result of having filed a petition for relief under the Bankruptcy Code.  Each Seller has, as applicable, the requisite corporate or limited liability company power and authority to own, lease and operate its properties and to carry on its business as currently conducted.  Each Seller is duly qualified or licensed to do business in each jurisdiction such qualification or licensing necessary for the operation of the Business as currently conducted, except where the failure to be so qualified would not reasonably be expected to be material.

**Section 3.2    Authorization; Enforceability**.  Subject to entry of Bankruptcy Sale Orders in both the ITS Case and Diverse Cases and any such other authorization or approval as are required by the Bankruptcy Court, each Seller has, as applicable, the requisite corporate or limited liability company power and authority necessary to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate or limited liability company action, as applicable, on the part of each Seller. Each Seller believes that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court, a sale, transfer and assignment of the Acquired Assets to Purchaser pursuant to this Agreement under Sections 105 and 363 of the Bankruptcy Code is in the best interests of such Seller and its creditors.

- 13 -

Section 3.3     **Financial Statements**.

(a)     Complete copies of the unaudited financial statements consisting of the consolidated balance sheet of Diverse Texas and its subsidiaries as of December 31, 2014 and the related income statement and statement of cash flow for the year then ended (the "2014 Financial Statements"), and the unaudited financial statements consisting of the consolidated balance sheet of Diverse Texas and its subsidiaries as of September 30, 2015 and the related income statement and statement of cash flow for the nine-month period then ended (the "Interim Financial Statements" and, together with the 2014 Financial Statements, the "Financial Statements") are set forth on Schedule 3.3(a).

(b)     Schedule 3.3(b) sets forth the back-log of each Seller as of November 30, 2015 setting forth the applicable (i) customer, (ii) order date, and (iii) order amount.  The back-log for each Seller represents bona fide orders under Contracts that were made in the ordinary course, but some of the orders may not have firm delivery dates and Sellers do not believe any of their orders have been cancelled.

Section 3.4     **Litigation**.   Except for the ITS Case, the Diverse Cases and pleadings, complaints and motions that have been filed or may be filed therein, there is no Legal Proceeding or Order pending, outstanding or, to the Knowledge of Sellers, threatened against any Seller that seeks to restrain or prohibit or otherwise challenge the consummation, the legality or validity of the transactions contemplated hereby.

Section 3.5     **Title to Acquired Assets; Sufficiency**.  Subject to the entry of the Bankruptcy Sale Order, Sellers own the Acquired Assets and Seller shall provide a special warranty deed to such Acquired Assets, free and clear of all Liens (including any and all prepetition and postpetition adequate protection Liens of Sellers' prepetition lenders) other than (a) Liens created by the Purchaser, (b) Permitted Encumbrances and (c) Liens expressly assumed by Purchaser (or its designated affiliate or affiliates) as Assumed Liabilities under this Agreement.   Neither AFG nor ITS Water hold any assets that are used in the Business.

Section 3.6     **Tax Matters**.  There are no Liens for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

Section 3.7     **Intellectual Property**.  Schedule 3.7 sets forth a complete and accurate list of all material Acquired Intellectual Property to the Knowledge of Sellers, Sellers own or have valid licenses to use all Acquired Intellectual Property.  Except for any Excluded Assets and claims for Intellectual Property made by COR Thermotics, LLC, the Acquired Intellectual Property comprises all of the Intellectual Property necessary for the operation of the Business as currently conducted.  The Acquired Intellectual Property is subsisting, in full force and effect, and has not been cancelled, abandoned, expired or otherwise terminated.  To the Knowledge of Sellers, no Person is infringing, violating or misappropriating any of the Acquired Intellectual Property owned by Sellers in any material respect.   As of the date of this Agreement, there is no pending claim, demand, or proceeding challenging the validity, enforceability or ownership of, or the right to use, any of the Acquired Intellectual Property and, to the Knowledge of Sellers, there is no such

- 14 -

threatened claim, demand or proceeding, other than claims made by COR Thermotics, LLC.

**Section 3.8**   **Employee Benefits/Labor**.

(a)     Sellers have provided Purchaser with (i) a list of all employees of Sellers, including all salaries and positions of such individuals and (ii) copies or summaries of all material employee benefit plans and arrangements, including all bonus or other incentive plans, compensation, severance pay, sick leave, vacation pay, disability, medical, and life insurance.

(b)     Except as otherwise contemplated or provided for under the terms of this Agreement, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any Transferred Employee (other than accrued vacation), (ii) increase any benefits otherwise payable under any employee benefit plan, or (iii) result in the acceleration of the time of payment or vesting of any such benefits.

(c)     Except as set forth on Schedule 3.8(c), no Seller, nor any of their respective subsidiaries, is a party to any labor or collective bargaining agreement.

**Section 3.9**   **Environmental and Health and Safety Matters**.  Except as set forth on Schedule 3.9:

(a)     to the Knowledge of Sellers, the current operations of the Business comply with all applicable Environmental Laws, and Sellers have not received written notice alleging that the activities of the Business are in violation of any Environmental Laws;

(b)     to the Knowledge of Sellers, there has been no, Release of any Hazardous Substances at or in the vicinity of any property currently or formerly owned, leased or used by any Seller that requires reporting under applicable Environmental Laws;

(c)     no Seller has entered into or been subject to any consent decree, compliance order or administrative order with respect any Environmental Condition or received any written request for information, notice, demand letter, administrative inquiry or complaint or claim with respect to any Environmental Condition or any Environmental Laws;

(d)     to the Knowledge of Sellers, no Seller has assumed, undertaken or otherwise become subject to any liability of any other Person relating to or arising from any Environmental Laws; and

(e)     Sellers have delivered, or caused to be delivered, to Purchaser copies of all documents, records and information in its possession or control concerning Environmental Conditions, including previously conducted environmental site assessments, compliance audits, asbestos surveys and documents regarding any

- 15 -

Release of Hazardous Substance at, upon or from any property currently or formerly owned, leased or used by any Seller, and environmental agency reports and correspondence.

Section 3.10    **Compliance with Laws; Permits**.   To the Knowledge of Sellers, each Seller (a) is, and since the date two years prior to the date of this Agreement has been, in compliance with all, and not subject to any liability pursuant to any, laws applicable to the operation of the Business, except where the failure to be in compliance would not reasonably be expected to be material, and (b) has all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not reasonably be expected to be material to the Business.

Section 3.11    **Major Customers**.   Schedule 3.11 sets forth a true and correct list of the ten largest customers of the Business (by dollar volume of sales) during each of the calendar years ended December 31, 2013 and December 31, 2014 and for the nine-months ended September 30, 2015 (the "Major Customers") and the amount for which each such customer was invoiced by Sellers during such periods.   To the Knowledge of Sellers, Sellers have received no written notice that any Major Customer, and to the Knowledge of Sellers, no Major Customer, intends to cease engaging the services of the Business, or intends to alter the use of such services, after the Closing except potentially Dominion Transmission, Inc.

Section 3.12    **Major Suppliers**.   Schedule 3.12 sets forth a true and correct list of the ten largest suppliers from which any Seller ordered raw materials, supplies, merchandise and other goods for the Business (by dollar volume of purchases) during each of the calendar years ended December 31, 2013 and December 31, 2014 and the nine-months ended September 30, 2015 (the "Major Suppliers"), and the amount paid to each such supplier by Sellers during such periods.

Section 3.13    **Contracts**.   Each Purchased Contract is a valid and binding obligation of the applicable Seller party thereto and, to the Knowledge of Sellers, the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by (a) bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity).   To the Knowledge of Sellers, no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any such Contract or would cause the acceleration of any obligation of any Seller or, to the Knowledge of Sellers, any other party thereto or the creation of a Lien upon any Acquired Asset.

Section 3.14    **Real Property**.

(a)    Schedule 3.14(a) sets forth a list of the Acquired Real Property.   The Acquired Real Property constitutes all interests in real property which are necessary for the continued operation of the Business as currently conducted.

- 16 -

(b)      Schedule 3.14(b) sets forth a true and complete list of all real property leases, subleases or other agreements (each lease, sublease or other agreement, including all amendments thereto, a "Real Property Lease") under which any Seller has a leasehold or subleasehold estate or otherwise uses or occupies or has the right to use or occupy any real property (such property subject to such Real Property Leases, collectively the "Leased Real Property") and, for each parcel of Leased Real Property, identifies the street address and such Seller that is the lessee or sublessee of such Leased Real Property.  Sellers have delivered or made available to Purchaser true and complete copies of all Real Property Leases, including all amendments, modifications, extensions and guaranties relating thereto.

(c)      Subject to entry of the Bankruptcy Sale Orders, Sellers have valid fee simple title to the Acquired Owned Property, free and clear of all Liens, except for Permitted Encumbrances.  Sellers have delivered or made available to Purchaser true and complete copies of all warranty deeds and other documents relating to the Acquired Owned Property.

(d)      To the Knowledge of Sellers, there is no pending condemnation, eminent domain proceeding or like legal proceeding, or sale or other disposition in lieu of condemnation by any Governmental Body affecting the Acquired Real Property or any part thereof.

**Section 3.15   Financial Advisors**.  No Seller has any liability or obligation to pay any fees or commissions to any broker, finder or other similar agent with respect to the transactions contemplated by this Agreement for which Purchaser could become liable or obligated.

**Section 3.16   Condition of Acquired Assets**. Except for the representations and warranties contained in this Article III (as modified by the Schedules thereto), Sellers nor any other Person makes any other expressed or implied representation or warranty on behalf of any Seller with respect to the Acquired Assets, the Assumed Liabilities, the Business or the transactions contemplated by this Agreement.  The Acquired Assets are all sold and transferred by each Seller to Purchaser "AS IS, WHERE IS," "WITH ALL FAULTS."   Purchaser hereby acknowledges that in purchasing the Acquired Assets pursuant to this Agreement (a) Purchaser is solely and exclusively relying upon its own due diligence, inspection and assessment of the Acquired Assets, (b) Purchaser is not relying upon any statement, representation or warranty of any Seller, except as expressly set forth herein, and (c) Purchaser acknowledges that, the acknowledgements and representations contained in this Section 3.16 are a material inducement for Sellers to enter into this Agreement and that Sellers would not have entered into this Agreement but for such acknowledgements and warranties.

## ARTICLE IV.- REPRESENTATIONS AND WARRANTIES OF PURCHASER

The representations and warranties set forth in this Article IV are made to Sellers by Purchaser as follows:

- 17 -

**Section 4.1    Organization and Good Standing**.  Purchaser is an entity duly organized, validly existing and in good standing under the laws of the state of its incorporation and has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

**Section 4.2    Authorization of Agreement**.    Purchaser has the requisite corporate power and authority necessary to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Purchaser.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered by Purchaser.    Assuming the due authorization, execution and delivery by the other Parties and the approval of the Bankruptcy Court, this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium and similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

**Section 4.3    Non-Contravention; Consents**.  No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by Purchaser of any other action contemplated hereby or thereby, except for such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make, would not, individually or in the aggregate, reasonably be expected to materially impair Purchaser's ability to consummate the transactions contemplated hereby.

**Section 4.4    Financial Advisors**.  Purchaser has no liability or obligation to pay any fees or commissions to any broker, finder or other similar agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated.

## ARTICLE V.- COVENANTS

**Section 5.1    Mutual Cooperation**.    Sellers and Purchaser shall reasonably cooperate with each other and use (and will cause their respective affiliates to use) their respective commercially reasonable efforts, to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable on their part under this Agreement and applicable laws, rules and regulations to consummate the transactions

- 18 -

contemplated in this Agreement as soon as practicable, including preparing and filing as promptly as practicable all documentation to affect all necessary notices, reports and other filings, responding promptly to any requests for further information and to obtain as promptly as practicable all consents, registrations, approvals, Permits and authorizations necessary or advisable to be obtained from any Person in order to consummate the transactions contemplated in this Agreement as promptly as practicable. This shall include obtaining all necessary approvals or orders from the Bankruptcy Court in both the ITS Case and the Diverse Cases.

Section 5.2    **Notification of Certain Matters**. Sellers shall notify Purchaser of any matter that in any way materially affects the Acquired Assets, the Business (including the termination of employment with any Seller by an employee of the Business), or the transactions contemplated by this Agreement, and (a) arises after the date hereof or (b) makes it necessary to correct any information in any Schedule to this Agreement or in any representation and warranty of any Seller that has been rendered materially inaccurate thereby.  Each such notification shall be made no later than two Business Days after discovery thereof and no later than three Business Days before the date set for the Closing by the Parties.

Section 5.3    **Conduct of Sellers Prior to Closing**.

(a)    Except as (i) set forth on Schedule 5.3(a), (ii) as required by applicable law, (iii) as otherwise expressly contemplated by this Agreement, or (iv) with Purchaser's prior written consent or the approval of the Bankruptcy Court (provided that no Seller shall petition, seek, request or move for any Order of the Bankruptcy Court approving or creating an exception on the obligations of Sellers set forth in this Section 5.3, or authorize, support or direct any other Person to petition, seek, request or move for any such Order), during the period from the date of this Agreement to and through the Closing Date, Sellers (x) will (A) conduct the Business only in the ordinary course and (B) use their commercially reasonable efforts excluding paying amounts that may be owing to customers and suppliers of the Business to (1) preserve the present business operations, organization and goodwill of the Business, including the preservation of the present employee base of the Business, and (2) preserve the present relationships with customers and suppliers of the Business; provided, however, that, subject to the above parenthetical, Sellers may act outside of the ordinary course as is required by the Bankruptcy Code and (y) will not, in connection with the Business:

(i)    directly or indirectly sell, license, convey, lease or otherwise transfer or offer, agree or commit (in writing or otherwise) to sell, license, convey, lease or otherwise transfer, any of the Acquired Assets, other than the sales or use of any of the Acquired Assets in the ordinary course;

(ii)    permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien or claim;

- 19 -

(iii)  waive, release or assign any material rights or claims of any Seller that constitutes an Acquired Asset;

(iv)  enter, terminate or amend any Purchased Contract other than in the ordinary course;

(v)  institute, settle or agree to settle any material proceeding before any Governmental Body relating to the Acquired Assets;

(vi)  (A) increase the level of compensation of any employee, (B) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any employee, director or consultant, (C) increase the coverage or benefits available under any (or create any new) employee benefit plan or (D) terminate any employee; or

(vii)  enter into any transaction or take any other action that could be reasonably expected to cause or constitute a material breach of any representation or warranty made by Sellers in this Agreement

Notwithstanding any of the foregoing, Sellers shall be entitled to solicit offers to purchase the Acquired Assets in accordance with the ITS Sales Procedures Order and the Diverse Sales Procedures Order and consummate any such sale approved by order of the Bankruptcy Court.

**Section 5.4  Allocation of Expenses**.  Unless otherwise expressly set forth in this Agreement, Sellers are responsible for all expenses related to the Acquired Assets prior to the Closing Date, and Purchaser is responsible for all such expenses to the extent relating to ownership of such assets after the Closing Date.

**Section 5.5  Access and Investigation**.  From the date hereof until the Closing or, if earlier, the termination of this Agreement in accordance with its terms, and upon reasonable advance notice from Purchaser, Sellers will allow Purchaser and its representatives (including any potential debt financing sources) reasonable access during normal business hours and without unreasonable interference with the operation of the business of Sellers to (a) such materials and information about Sellers and the Business as Purchaser may reasonably request and (b) the properties, officers, directors, employees, accountants and financial advisors of Sellers as Purchaser may reasonably request.  The foregoing will not (i) include access or information which Sellers are expressly prohibited by law from granting or disclosing or (ii) require Sellers take any action which would, in the advice of counsel, constitute a waiver of any legal privilege, including the attorney-client privilege or the attorney work product privilege.

- 20 -

## ARTICLE VI. - CONDITIONS TO CLOSING

**Section 6.1    Conditions to Obligations of Purchaser**. Purchaser's obligation to purchase the Acquired Assets and to take the other actions required to be taken by Purchaser at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived in writing by Purchaser, in whole or in part):

(a)    Bankruptcy Sale Order. Sellers shall have obtained the entry of Bankruptcy Sale Orders in both the ITS Case and the Diverse Cases providing for the sale of the Acquired Assets to Purchaser free and clear of all Liens, other than the Permitted Encumbrances, pursuant to the terms of this Agreement. The Bankruptcy Sale Orders shall be in form and substance reasonably satisfactory to Purchaser and, as of the date of Closing, shall not be subject to a stay by any court, shall be a Final Order, and shall provide such other relief as may be reasonably necessary or appropriate to allow for the consummation of the transactions contemplated by this Agreement.

(b)    Representations, Warranties, and Covenants of Sellers. (i) Each of the representations and warranties made by Sellers in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date (as if made anew at and as of the Closing); and (ii) Sellers shall have performed and complied in all respects with all terms, agreements, and covenants contained in this Agreement required to be performed or complied with by Sellers on or before the Closing Date, and Purchaser shall have received a certificate signed by Todd Hass, Chief Financial Officer of each Seller, dated as of the Closing Date, to the foregoing effect.

(c)    No Prohibition or Injunction.  No provision of any applicable law and no order or proceeding shall be in effect that shall prohibit or restrict the consummation of the transactions contemplated by this Agreement, or that is reasonably likely to cause a material adverse change to any of the Acquired Assets or to cause the Purchaser or any of its affiliates to suffer any material adverse consequence under any applicable legal requirement or order.

(d)    Specified Agreements.  The agreements between Purchaser and each of NOV, Fountain, Nations and Grand including as assignee of Integral Equipment Leasing, LLC described in Recitals G, H, I and J, respectively, shall have been executed and remain in full force and effect as of the Closing.

(e)    Deliverables.  Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.5(c).

**Section 6.2    Conditions to Obligations of Sellers**.  Sellers' obligations to sell the Acquired Assets a to take the other actions required to be taken by Sellers at the Closing are subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived in writing by Sellers, in whole or in part):

- 21 -

(a)     <u>Representations, Warranties, and Covenants of Purchaser</u>.  (i) Each of the representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date (as if made anew at and as of the Closing); and (ii) Purchaser shall have performed and complied in all material respects with all terms, agreements, and covenants contained in this agreement required to be performed or complied with by Purchaser on or before the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect.

(b)     <u>Bankruptcy Court Approval</u>.  The Bankruptcy Sale Orders (i) shall have been entered in both the ITS Case and the Diverse Cases in form and substance reasonably acceptable to Sellers, (ii) shall not be subject to a stay as of the date of Closing, and (iii) shall provide such other relief as may be reasonably necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement.

(c)     <u>No Prohibition or Injunction</u>.  No provision of any applicable law and no order or proceeding shall be in effect that shall prohibit or restrict the consummation of the Closing, or that is reasonably likely to cause a material adverse change to any of the Acquired Assets or to cause Purchaser or any of its affiliates to suffer any material adverse consequence under any applicable legal requirement or order.

(d)     <u>Release of Claims</u>.  Purchaser shall deliver to Sellers evidence of the release of any claims against Sellers and Sellers' respective bankruptcy estates from each of NOV, **[**Fountain, Nations and Grand**]**, or Purchaser as assignee of any such parties, in each case, with respect to their respective agreements described in Recitals G, **[**H, I and J**]**.[6]

(e)     Purchaser shall pay to Sellers at Closing an amount equal to the amount estimated by Sellers to be collected by Purchaser subsequent to the Closing for sales taxes owing to various taxing authorities relating to pre-Closing invoices issued by a Seller to a customer.  The funds received by Seller pursuant to the terms of this paragraph shall be held in trust by Sellers for the payment of sales taxes owing to various taxing authorities.  In the event the estimated payment made to Sellers pursuant to this paragraph exceed the actual tax amounts owing, such excess shall be promptly returned to Purchaser.

(f)     <u>Deliverables</u>.  Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 2.5(d)</u>.

## ARTICLE VII. - OTHER AGREEMENTS

**Section 7.1     Employees**.  Purchaser (or an affiliate of Purchaser), at its sole discretion, may desire to hire or employ certain employees of Sellers, on or after the Closing Date. Any such employee that accepts such employment, a "<u>Transferred Employee</u>."

---

[6]     **Note to Draft**:  Releases against the estate have not yet been obtained by such parties and remain under consideration.

Sellers shall terminate all employees who are offered employment by Purchaser (or an affiliate of Purchaser) effective as of the Closing Date or at such other time as may be agreed between the Parties.  Sellers agree that Purchaser retains sole and complete discretion with respect to which employees of Sellers to which Purchaser (or an affiliate of Purchaser) will offer employment.  Sellers shall be solely responsible for any obligations and liabilities related in any way to any termination of any of Sellers' employees from employment with Sellers occurring prior to or after the date of this Agreement, whether or not in connection with the transaction contemplated hereby. Sellers shall be solely responsible for all liabilities for employee or independent contractor compensation and benefits accrued or otherwise arising out of services rendered by its employees, directors and independent contractors prior to the Closing Date or arising by reason of actual, constructive, or deemed termination of their service relationship with Sellers at Closing, including all costs relating to the continuation of health benefits with respect to employees not hired by Purchaser after the Closing Date.

**Section 7.2**   **Casualty and Insurance**.  In the event all or any one of the Acquired Assets is damaged or destroyed prior to the Closing Date, Purchaser shall have the option to either: (a) exclude the damaged Acquired Asset from this Agreement and reduce the Purchase Price by an amount equal to the value of the Acquired Asset, in which event the applicable Seller will retain any applicable insurance proceeds; or (b) apply the insurance proceeds for the damaged Acquired Assets to be assigned from Sellers to Purchaser, and proceed with the transaction. Sellers agree to maintain insurance on all of the Acquired Assets up to the Closing Date and to reasonably assist Purchaser to obtain insurance coverage on the Acquired Assets after the Closing Date. The risk of loss on the Acquired Assets remains on Sellers until the Closing.

**Section 7.3**   **Reservation of Rights Amongst Sellers Regarding Certain Asset Ownership**.   Notwithstanding anything seemingly to the contrary contained in this Agreement, ITS and the Diverse Debtors, and their respective bankruptcy estates, reserve any and all rights, claims and arguments by and amongst them regarding the allocation of Purchase Price.

**Section 7.4**   **Release**.  In consideration for the Purchase Price, as of and following the Closing Date, each Seller, on its own behalf and on behalf of its affiliates, knowingly, voluntarily and unconditionally releases and forever discharges any Transferred Employee from or for any and all claims, causes of action, demands, suits, liabilities, damages, losses, costs and expenses (including attorneys' fees) of every kind or nature whatsoever, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, that such Seller has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date to the extent related to the operations of the Business of Sellers or the Acquired Assets expressly excluding claims or causes of action for fraud, theft or other intentional misconduct (a "Potential Claim"). Each Seller hereby (a) expressly waives all provisions of, and rights and benefits conferred by any law that provides that a general release does not extend to claims that are unknown or unsuspected to the releasor at the time the releasor executes the release and (b)

- 23 -

irrevocably covenants to refrain from asserting any Potential Claim, or commencing, instituting or causing to be commenced, any Legal Proceeding against Purchaser or such released individuals, or any of their respective affiliates, in any forum whatsoever (including any administrative agency).

## ARTICLE VIII. - BANKRUPTCY

**Section 8.1    Bankruptcy Court Approval**.  Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval in the Bankruptcy Sale Orders.

**Section 8.2    Commercially Reasonable Efforts**.  Sellers and Purchaser agree to use commercially reasonable efforts to do such acts and things and to execute and deliver such agreements and instruments and to take all such actions as may reasonably be required to consummate, evidence, confirm or obtain the Bankruptcy Court approval of the sale of the Acquired Assets in accordance with the terms of this Agreement, subject to higher and/or better Competing Transactions.

**Section 8.3    Bankruptcy Sale Orders**.  The Bankruptcy Sale Orders shall be in form and substance reasonably acceptable to both Sellers and Purchaser approving and authorizing Sellers to consummate this Agreement and the transactions contemplated by this Agreement, including the sale of the Acquired Assets to Purchaser free and clear of all Liens other than Permitted Encumbrances.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bankruptcy Sale Orders, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Sellers shall use their reasonable best efforts to obtain a ruling that the Bankruptcy Sale Order is immediately effective notwithstanding the provisions of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

## ARTICLE IX. - TERMINATION

**Section 9.1    Termination Events**.  This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)    Mutual Termination.  Purchaser and Sellers may terminate this Agreement (i) by mutual written consent or (ii) by notice to the other Parties if the Closing has not occurred by 6:00 p.m. central time on January 29, 2016.

(b)    Automatic Termination.  This Agreement shall terminate automatically without any action or notice by Sellers to Purchaser or Purchaser to Sellers immediately upon: (i) the issuance of a final and non-appealable Order by a Governmental Body to restrain, enjoin, or otherwise prohibit the transfer of the Acquired Assets, to Purchaser as contemplated by this Agreement; or (ii) the closing of a Competing Transaction.

- 24 -

(c)    Termination by Purchaser.  Purchaser may terminate this Agreement: (i) if the Bankruptcy Court has not entered the Bankruptcy Sale Orders in both the ITS Case and Diverse Cases by January 22, 2016 (with respect to this Agreement); (ii) if there has been a material violation or breach by any Seller of any material representation, warranty, or covenant contained in this Agreement; (iii) if prior to the Closing Date, either the ITS Case or the Diverse Cases are converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case; (iv) if an event or circumstance has a material adverse effect on the value of the Acquired Assets; (v) if any condition precedent to the Closing has not been met by the Closing Date; (vi) if any secured creditor obtains relief from the automatic stay provided by Section 362 of the Bankruptcy Code to foreclose on any material Acquired Asset, or if any secured creditor takes any material, adverse action with respect to any material Acquired Asset; or (vii) some or all of the Sellers execute an agreement with respect to a Competing Transaction.

(d)    Termination by Sellers.  Sellers may terminate this Agreement if (i) the Bankruptcy Court dismisses or converts the Bankruptcy Cases pursuant to sections 1112(b) or 305(a) of the Bankruptcy Code, or (ii) there has been a material breach or violation by Purchaser of a material representation, warranty, or covenant contained in this Agreement.

**Section 9.2    Effect of Termination**. In the event Sellers default under this Agreement, Purchaser may elect to enforce specific performance of this Agreement as opposed to terminating this Agreement.  If this Agreement is terminated for any reason other than pursuant to Section 9.1(d)(ii), the Trust Deposit shall be returned to Purchaser, and this Agreement shall terminate and be of no further force and effect.  Purchaser shall have no other or further claim against Sellers, including for any damages for loss of its bargain or expenses incurred by Purchaser in connection with this Agreement. If this Agreement is terminated pursuant to Section 9.1(d)(ii), Sellers shall retain the Trust Deposit as its sole and exclusive remedy as against Purchaser.

## ARTICLE X. - MISCELLANEOUS

**Section 10.1    Governing Law, Jurisdiction**.

(a)    This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Texas (without giving effect to the principles of conflict of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law. For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in Harris County, Texas.

- 25 -

(b)      Each of the Parties hereby consents to process being served by any party to this Agreement in any Legal Proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.3.

**Section 10.2   JURY TRIAL WAIVER**. EACH PARTY HEREBY WAIVES AND RELINQUISHES ANY RIGHT TO TRIAL IN ANY LAWSUIT OR JUDICIAL PROCEEDING IN ANY WAY RELATING TO, PERTAINING TO, OR ARISING OUT OF THIS AGREEMENT OR ANY DOCUMENT EXECUTED PURSUANT HERETO.

**Section 10.3   Notices**.    All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) upon receipt of confirmation of receipt if sent by facsimile transmission, (c) on the day such communication was sent by e-mail or (d) one Business Day following the day sent by overnight courier, in each case at the following addresses, facsimile numbers and e-mail (or to such other address, facsimile number or e-mail as a party may have specified by notice given to the other party pursuant to this provision):

If to Sellers, including ITS Water and AFG to:

> Diverse Energy Systems, LLC; Diverse Energy Systems, LLC, d/b/a Lean Technologies, LLC; Rouly, Inc.; and Scribner Industries, Inc.
> c/o John Boylan, Chief Restructuring Officer
> EJC Ventures, LP
> 801 Travis, Suite 1425
> Houston, TX 77002
> E-mail: jboylan@ejc-ventures.com

> ITS Engineered Systems, Inc.
> c/o Cary Grossman, Chief Restructuring Officer
> Shoreline Capital Advisors**,** Inc.
> Three Riverway, Suite 1010
> Houston, TX 77056
> E-mail: cgrossman@shorelinecapitaladvisors.com

with a copy (which will not constitute notice) to:

> Bobby Forshey
> Forshey & Prostok, L.L.P.
> 777 Main Street, Suite 1290
> Fort Worth, TX 76102
> E-mail: bforshey@forsheyprostok.com

> Micheal W. Bishop
> Gray Reed & McGraw, P.C.
> 1601 Elm Street, Suite 4600
> Dallas, TX 75201
> E-mail: mbishop@grayreed.com

- 26 -

If to Purchaser, to:

> Cimarron Acquisition Co.
> c/o Turnbridge Capital Management, LLC
> 100 Crescent Court, Suite 800
> Dallas, TX 75201
> Attention:    Todd M. Tomlin
> E-mail:        ttomlin@turnbridgecapital.com

with a copy (which will not constitute notice) to:

> Jones Day
> 2727 North Harwood Street
> Dallas, Texas  75201
> Facsimile: (214) 969-5100
> Attention:   R. Scott Cohen
>                     Michael Considine
> Email:         scohen@jonesday.com
>                     mpconsidine@jonesday.com

**Section 10.4   Assignment**.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.   No assignment of this Agreement or of any rights or obligations hereunder may be made by any Seller or the Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; provided, however, that Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more wholly-owned subsidiaries formed by it prior to the Closing.

**Section 10.5   Severability**. In the event any provision of this Agreement is found to be void and unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall nevertheless be binding upon the Parties with the same effect as though the void or unenforceable part had been severed and deleted.

**Section 10.6   Counterparts**. This Agreement may be executed in one or more counterparts, including facsimile or electronic counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**Section 10.7   Entire Agreement; Amendments and Waivers**. This Agreement, including the Schedules and Exhibits hereto, contains the entire understanding and agreement between the Parties with respect to the subject matter hereof. This Agreement supersedes all prior agreements and understandings between the Parties with respect to such subject matter.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference

- 27 -

to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained in this Agreement.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

## ARTICLE XI.- DEFINED TERMS

**Section 11.1    Certain Definitions**.  For purposes of this Agreement, the following terms, when used in this Agreement with initial capital letters, have the meanings specified in this Section 11.1 or in other Sections of this Agreement identified in Section 11.2:

"Account" shall have the same meaning as in section 9.102(a)(2) of the UCC, but shall exclude any Accounts owing by the Diverse Debtors to ITS or among any of the Sellers.

"Acquired Intellectual Property" means the Intellectual Property owned by any Seller.

"Acquired Owned Property" means collectively, the Diverse Real Estate and the Rouly Real Estate.

"Acquired Real Property" means collectively, Acquired Owned Property and the Real Estate Leases.

"AFG" means Acquisitions Finance Group, Inc., a Delaware corporation.

"Auction" has the meaning set forth in the Bidding Procedures.

"Avoidance Actions" means all avoidance actions or similar causes of action and associated remedies arising under sections 544 through 553 of the Bankruptcy Code.

"Bankruptcy Sale Order" or "Bankruptcy Sale Orders" means orders of the Bankruptcy Court, respectively entered in the Diverse Cases and the ITS Case, authorizing the sale of Acquired Assets pursuant to this Agreement.

"Bidding Procedures" means the bidding procedures attached to Exhibit A.

"Business Day" means any day of the year on which banking institutions in New York City are open to the public for conducting business and are not required or authorized to close.

"Code" means the Internal Revenue Code of 1986, as amended.

- 28 -

"Competing Transaction" means any of the following, other than the transactions contemplated by this Agreement: (a) the sale or disposition by Sellers of all or the majority of the outstanding equity interests of any Seller or the sale or disposition of all or the majority of the Acquired Assets, in either case which substantially prohibits or impairs the transactions contemplated by this Agreement, including a transaction that is the result of a successful bid by any Person other than Purchaser at the Auction; or (b) a merger, consolidation, business combination, liquidation, recapitalization or similar transaction of all or substantially all of the Acquired Assets.  However, "Competing Transaction" shall not include the disposition of any Acquired Assets or otherwise upon the conversion of any of Sellers' bankruptcy cases to proceedings under Chapter 7 of the Bankruptcy Code, or the foreclosure or other execution of state law remedies by a secured creditor or lessor against their respective collateral or property.

"Contract" means any contract, indenture, note, bond, lease or other agreement, whether written or oral.

"Customer Deposits" means any deposits paid to any Seller on account of any goods to be or being fabricated by such Seller.

"Environment" means soil, surface waters, groundwater, land, stream sediments, surface or subsurface strata, ambient air, indoor air or indoor air quality, including, without limitation, any material or substance used in the physical structure of any building or improvement.

"Environmental Condition" means any condition of the Environment with respect any property currently or previously owned, leased or operated by any Seller or with respect to any other real property at which any Hazardous Substance generated by the operation of the Business prior to the Closing Date has been treated, stored or disposed of, which violates any Environmental Law, or results in any Release, or threat of Release, damage, loss, cost, expense, claim, demand, order or liability.

"Environmental Law" means any law, policy or guideline relating to protection of the Environment, Releases of Hazardous Substances, public or workplace health and safety or injury to Persons relating to exposure to any Hazardous Substance.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) (a) under common control within the meaning of Section 4001(b)(1) of ERISA with any of Sellers or (b) which together with any of Sellers is treated as a single employer under Section 414(t) of the Code.

"Final Order" means an Order (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing, motion for reconsideration or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that

- 29 -

upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon, and (b) as to which the time for instituting or filing an appeal, motion for rehearing, motion for reconsideration or motion for new trial shall have expired; provided, however, that even if an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing, motion for reconsideration or motion for new trial are timely filed, an Order will be deemed a Final Order if it provides that it is effective immediately upon entry on the Court's docket and not subject to any stay notwithstanding the provisions of Federal Rule of Bankruptcy Procedure 6004(h), 6006(d), 7062 and Federal Rule of Civil Procedures 62, and that no stay pending appeal has been obtained.

"GAAP" means generally accepted accounting principles in the United States, consistently applied throughout the specified period and the immediately prior comparable period.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hazardous Substance" means any "toxic substance," "hazardous pollutant," "hazardous waste," "hazardous material" or "hazardous substance" under any Environmental Laws.

"Instruments" shall have the same meaning as in section 9.102(a)(47) of the UCC.

"Intellectual Property" means all worldwide intellectual property and rights, title and interests arising from or in respect of the following: all (a) inventions, discoveries, industrial designs, utility models, business methods, patents and patent applications (including provisional and Patent Cooperation Treaty applications), including continuations, divisionals, continuations-in-part, reexaminations and reissues, extensions, renewals and any patents that may be issued with respect to the foregoing (collectively, "Patents"); (b) trademarks, service marks, certification marks, collective marks, trade names, business names, slogans, acronyms, forms of advertisement, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, designs, devices, signs, symbols, design rights including product design, configuration and packaging rights, internet domain names, user names, screen names, internet and mobile account names, icons, symbols or designations, corporate names, and general intangibles of a like nature and other indicia of identity, origin or quality, whether registered, unregistered or arising by law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing (collectively, "Trademarks"); (c) published and unpublished works of authorship in any medium, whether copyrightable or not, whether in final form or not, in all media now known or hereafter created, including writings, graphics, artworks, photographs, compositions, sound recordings, motion pictures and audiovisual works, databases and other compilations of information, computer software, mobile and internet applications and content, source code, object code, algorithms, and other similar materials, all packaging, advertising and promotional materials related to the products,

- 30 -

and all copyrights and moral rights, to the fullest extent assignable or waivable, therein and thereto, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof (collectively, "<u>Copyrights</u>"); and (d) confidential and proprietary information, trade secrets, and know-how, including methods, processes, business plans, strategy, marketing data, marketing studies, advertisements, schematics, concepts, software and databases (including source code, object code and algorithms), formulae, recipes, drawings, prototypes, models, designs, devices, technology, research and development and customer information and lists (collectively, "<u>Trade Secrets</u>"), together with all rights of action for past, present and future infringement of any of the foregoing Intellectual Property and the right to receive all proceeds and damages therefrom.

"<u>Inventory</u>" shall mean inventory (including raw materials), as defined in section 9.102(a)(48) of the UCC as of a specified date.

"<u>IRS</u>" means the Internal Revenue Service.

"<u>ITS Water</u>" means ITS Water Solutions, Inc., a Delaware corporation.

"<u>Knowledge of Sellers</u>" means the actual knowledge of those officers of each of Sellers respecting their entities and their respective bankruptcy estates, on a several and not a joint basis, identified on <u>Schedule 11.1(a)</u>.

"<u>Legal Proceeding</u>" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"<u>Order</u>" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"<u>Permits</u>" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"<u>Person</u>" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"<u>Release</u>" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment.

"<u>Taxes</u>" means: (a) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, Inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes; (b) any item described in clause (a) for which a taxpayer is liable as a transferee or successor, by reason of being a member of an

- 31 -

affiliated, consolidated, combined or unitary group or the regulations under Section 1502 of the Code, or by Contract, indemnity or otherwise; and (c) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (a) or (b).

"Tax Authority" means any Governmental Body or employee thereof charged with the administration of any law relating to Taxes.

"Transfer Tax" means any sales, use, bulk transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, or based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"UCC" shall mean the Texas Business & Commerce Code.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar law, and the rules and regulations thereunder.

"WIP" shall mean work-in-progress as of a specified date, less any Customer Deposits attributable to any specific item of WIP as of such date.

**Section 11.2   Terms Defined Elsewhere in this Agreement**.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
| --- | --- |
| 2014 Financial Statements | 3.3(a) |
| Acquired Assets | 1.1 |
| Agreement | Preamble |
| Amended and Restated Agreement | Recitals |
| Assumed Liabilities | 1.7 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Books and Records | 1.5(d) |
| Business | Recitals |
| Closing | 2.5 |
| Closing Date | 2.5(a) |
| Convey | 1.1 |
| Copyrights | 11.1 |
| Cure Costs | 2.3 |
| Deposits | 1.5(a) |
| Diverse | Preamble |
| Diverse Accounts | 1.2(j) |
| Diverse Acquired Assets | 1.2 |
| Diverse Cases | Recitals |
| Diverse Debtors | Recitals |

- 32 -

| Term | Section |
|------|---------|
| Diverse Equipment | 1.2(a) |
| Diverse Furniture | 1.2(e) |
| Diverse Intellectual Property | 1.2(i) |
| Diverse Inventory | 1.2(b) |
| Diverse Real Estate | 1.2(d) |
| Diverse Real Estate Leases | 1.2(g) |
| Diverse Sales Procedures Order | Recitals |
| Diverse Texas | Preamble |
| Equipment Leases | 1.2(h) |
| Excluded Assets | 1.6 |
| Excluded Liabilities | 1.8 |
| Financial Statements | 3.3(a) |
| Fountain | Recitals |
| Grand | Recitals |
| Interim Financial Statements | 3.3(a) |
| ITS | Preamble |
| ITS Accounts | 1.3(g) |
| ITS Acquired Assets | 1.3 |
| ITS Case | Recitals |
| ITS Equipment | 1.3(a) |
| ITS Furniture | 1.3(d) |
| ITS Intellectual Property | 1.3(e) |
| ITS Inventory | 1.3(b) |
| ITS Option Rights | 1.3(f) |
| ITS Sales Procedures Order | Recitals |
| ITS WIP | 1.3(c) |
| Leased Real Property | 3.14(b) |
| Lien | 1.2 |
| Major Customers | 3.11 |
| Major Suppliers | 3.12 |
| Nations | Recitals |
| NOV | Recitals |
| Party | Preamble |
| Parties | Preamble |
| Patents | 11.1 |
| Permitted Encumbrances | 1.10 |
| Potential Claim | 7.4 |
| Purchase Price | 2.1 |
| Purchased Contracts | 1.2(f) |
| Purchaser | Preamble |
| Real Property Lease | 3.14(b) |
| Rental Equipment | 1.2(c) |
| Rouly | Preamble |
| Rouly Acquired Assets | 1.4 |
| Rouly Equipment | 1.4(a) |
| Rouly Furniture | 1.4(c) |
| Rouly Intellectual Property | 1.4(e) |
| Rouly Inventory | 1.4(b) |

- 33 -

| Term | Section |
|------|---------|
| Rouly Real Estate | 1.4(d) |
| Rouly Real Estate Leases | 1.4(f) |
| Scribner | Preamble |
| Seller | Preamble |
| Sellers | Preamble |
| Trade Secrets | 11.1 |
| Trademarks | 11.1 |
| Transferred Employee | 7.1 |
| Trust Deposit | 2.4 |

**Section 11.3   Other Definitional and Interpretive Matters.**

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)     Calculations. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Captions. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(iii)     Gender and Person. Wherever the context so requires, the masculine pronoun shall include the feminine and the neuter, the neuter pronoun shall include the feminine and the masculine, and the singular shall include the plural and the plural shall include the singular.

(iv)     Dollars. Any reference in this Agreement to $ will mean U.S. dollars.

(v)     Exhibits/Schedules.   All Exhibits and Schedules annexed hereto or referred to in this Agreement are hereby incorporated in and made a part of this Agreement as if set forth in full in this Agreement.  Any capitalized terms used in

- 34 -

any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

(vi) <u>Including</u>.   The word "including" or any variation thereof means "including, without limitation," and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(vii) <u>Herein</u>.   The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)   The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

*[remainder of page intentionally left blank]*

- 35 -

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written.

**SELLERS:**

DIVERSE ENERGY SYSTEMS, LLC,
a Texas Limited Liability Company


By: _____
    John Boylan, Chief Restructuring Officer


DIVERSE ENERGY SYSTEMS, LLC, D/B/A
LEAN TECHNOLOGIES, LLC, a North Dakota
Limited Liability Company


By: _____
    John Boylan, Chief Restructuring Officer


ITS ENGINEERED SYSTEMS, INC.


By: _____
    Cary Grossman, Chief Restructuring Officer


ITS ENGINEERED SYSTEMS, INC.


By: _____
    Todd Hass, Chief Financial Officer,


ITS ENGINEERED SYSTEMS, INC.


By: _____
    Roger Wagner, President


ROULY, INC.


[Asset Purchase Agreement]

By: _____
John Boylan, Chief Restructuring Officer


SCRIBNER INDUSTRIES, INC.


By: _____
John Boylan, Chief Restructuring Officer

[Asset Purchase Agreement]

**PURCHASER:**
CIMARRON ACQUISITION CO.


By: _____
Todd M. Tomlin, Secretary

[Asset Purchase Agreement]

# EXHIBIT "B"

ASSET PURCHASE AGREEMENT

BY AND AMONG

DIVERSE ENERGY SYSTEMS, LLC,

DIVERSE ENERGY SYSTEMS, LLC, D/B/A LEAN TECHNOLOGIES, LLC,

SCRIBNER INDUSTRIES, INC.,

ROULY, INC.,

ITS ENGINEERED SYSTEMS, INC.,

AND

CIMARRON ACQUISITION CO.

EFFECTIVE AS OF DECEMBERJANUARY [31•], 20152016

# TABLE OF CONTENTS

**Page**

ARTICLE I.　　　 - ACQUIRED ASSETS ............................................................ ~~2~~3

　　Section 1.1　　Acquired Assets ................................................................. ~~2~~3

　　Section 1.2　　Diverse Assets ................................................................... 3

　　Section 1.3　　ITS Assets ........................................................................ 4

　　Section 1.4　　Rouly Assets ...................................................................... ~~4~~5

　　Section 1.5　　Other Acquired Assets ........................................................ ~~5~~6

　　Section 1.6　　Excluded Assets ................................................................ 6

　　Section 1.7　　Assumed Liabilities ............................................................ 7

　　Section 1.8　　Excluded Liabilities ............................................................ ~~7~~8

　　Section 1.9　　Identification of Additional Excluded Assets ......................... ~~8~~9

　　Section 1.10　Permitted Encumbrances ..................................................... ~~8~~9

ARTICLE II.　　　 - PURCHASE PRICE AND CLOSING ................................ ~~9~~10

　　Section 2.1　　Purchase Price ................................................................... ~~9~~10

　　Section 2.2　　Liability for Taxes .............................................................. ~~9~~10

　　Section 2.3　　Cure Costs ........................................................................ ~~9~~10

　　Section 2.4　　Deposit ............................................................................ ~~9~~10

　　Section 2.5　　Closing ............................................................................ 10

　　Section 2.6　　Further Assurance; Post-Closing Cooperation ...................... 12

　　Section 2.7　　Allocation of Purchase Price .............................................. ~~12~~13

ARTICLE III.　　 - REPRESENTATIONS AND WARRANTIES OF SELLERS ...... ~~12~~13

　　Section 3.1　　Due Organization and Good Standing .................................. 13

　　Section 3.2　　Authorization; Enforceability ............................................. 13

　　Section 3.3　　Financial Statements ......................................................... ~~13~~14

　　Section 3.4　　Litigation .......................................................................... ~~13~~14

　　Section 3.5　　Title to Acquired Assets; Sufficiency .................................. 14

　　Section 3.6　　Tax Matters ...................................................................... 14

　　Section 3.7　　Intellectual Property .......................................................... 14

　　Section 3.8　　Employee Benefits/Labor .................................................. ~~14~~15

　　Section 3.9　　Environmental and Health and Safety Matters ...................... 15

- i -

**TABLE OF CONTENTS**
(continued)

**Page**

| | | | |
|---|---|---|---|
| Section 3.10 | Compliance with Laws; Permits | | ~~15~~16 |
| Section 3.11 | Major Customers | | ~~15~~16 |
| Section 3.12 | Major Suppliers | | 16 |
| Section 3.13 | Contracts | | 16 |
| Section 3.14 | Real Property | | 16 |
| Section 3.15 | Financial Advisors | | 17 |
| Section 3.16 | Condition of Acquired Assets | | 17 |
| ARTICLE IV. | - REPRESENTATIONS AND WARRANTIES OF PURCHASER | | ~~17~~18 |
| Section 4.1 | Organization and Good Standing | | ~~17~~18 |
| Section 4.2 | Authorization of Agreement | | ~~17~~18 |
| Section 4.3 | Non-Contravention; Consents | | 18 |
| Section 4.4 | Financial Advisors | | 18 |
| ARTICLE V. | - COVENANTS | | ~~18~~19 |
| Section 5.1 | Mutual Cooperation | | ~~18~~19 |
| Section 5.2 | Notification of Certain Matters | | ~~18~~19 |
| Section 5.3 | Conduct of Sellers Prior to Closing | | 19 |
| Section 5.4 | Allocation of Expenses | | 20 |
| Section 5.5 | Access and Investigation | | 20 |
| ARTICLE VI. | - CONDITIONS TO CLOSING | | ~~20~~21 |
| Section 6.1 | Conditions to Obligations of Purchaser | | ~~20~~21 |
| Section 6.2 | Conditions to Obligations of Sellers | | ~~21~~22 |
| ARTICLE VII. | - OTHER AGREEMENTS | | ~~22~~23 |
| Section 7.1 | Employees | | ~~22~~23 |
| Section 7.2 | Casualty and Insurance | | ~~22~~23 |
| Section 7.3 | Reservation of Rights Amongst Sellers Regarding Certain Asset Ownership | | ~~22~~23 |
| Section 7.4 | Release | | 23 |
| ARTICLE VIII. | - BANKRUPTCY | | ~~23~~24 |
| Section 8.1 | Bankruptcy Court Approval | | ~~23~~24 |

## TABLE OF CONTENTS
(continued)

**Page**

Section 8.2        Commercially Reasonable Efforts ................................ ~~23~~24

~~Section 8.3        Break-up Fee and Expense Reimbursement~~ ................. ~~23~~

Section ~~8.4~~8.3    Bankruptcy Sale Orders .................................. 24

ARTICLE IX.       - TERMINATION ................................................. 24

Section 9.1        Termination Events ........................................ 24

Section 9.2        Effect of Termination ..................................... 25

ARTICLE X.        - MISCELLANEOUS ............................................... 25

Section 10.1       Governing Law, Jurisdiction ............................... 25

Section 10.2       JURY TRIAL WAIVER ......................................... ~~25~~26

Section 10.3       Notices ................................................... 26

Section 10.4       Assignment ................................................ 27

Section 10.5       Severability .............................................. 27

Section 10.6       Counterparts .............................................. 27

Section 10.7       Entire Agreement; Amendments and Waivers ................. ~~27~~28

ARTICLE XI.       - DEFINED TERMS ............................................... 28

Section 11.1       Certain Definitions ....................................... 28

Section 11.2       Terms Defined Elsewhere in this Agreement ................. 32

Section 11.3       Other Definitional and Interpretive Matters .............. 34

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is entered into effective as of ~~December~~January [~~31~~•], ~~2015~~2016, by and among Diverse Energy Systems, LLC , a Texas limited liability company ("Diverse Texas"), Diverse Energy Systems, LLC, d/b/a Lean Technologies, LLC, a North Dakota limited liability company ("Diverse"), Scribner Industries, Inc., a Texas corporation ("Scribner"), Rouly, Inc., a New Mexico corporation ("Rouly"), ITS Engineered Systems, Inc., a Delaware corporation ("ITS"), and Cimarron Acquisition Co., a Delaware corporation ("Purchaser"). Diverse Texas, Diverse, Scribner, Rouly, and ITS are each referred to herein as a "Seller," and collectively as "Sellers."  Sellers and Purchaser are sometimes hereinafter collectively referred to as the "Parties" and individually as a "Party."

## RECITALS

A.    Sellers are in the business of fabricating, distributing and marketing various oilfield equipment (the "Business").  Sellers wish to sell, and Purchaser wishes to purchase, certain of the assets of Sellers upon the terms and subject to the conditions set forth in this Agreement.

B.    On April 17, 2015, ITS filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. sections 101 *et seq.* ("Bankruptcy Code"), commencing Case No. 15-32145 ("ITS Case") in the United States Bankruptcy Court for the Southern District of Texas ("Bankruptcy Court").

C.    On September 7, 2015, the following entities (sometimes hereinafter collectively referred to as the "Diverse Debtors"), each filed voluntary petitions for relief pursuant to the Bankruptcy Code in the Bankruptcy Court commencing the following bankruptcy cases (collectively the "Diverse Cases"):

(i)    Diverse Texas, Case no. 15-34736;

(ii)    Scribner, Case no. 15-34736;

(iii)    Diverse, Case no. 15-34738; and

(iv)    Rouly, Case no. 15-34739.

The Diverse Cases have been administratively consolidated under the Diverse Texas case.

D.    Sellers all continue to operate as debtors and debtors-in-possession pursuant to Chapter 11 of the Bankruptcy Code.  Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to acquire from Sellers, pursuant to Section 363 of the Bankruptcy Code, the Acquired Assets (as defined below), all at the price, and on the terms and conditions, as more specifically provided in this

Agreement. The Acquired Assets will be transferred to Purchaser free and clear of all Liens, claims and interests except as expressly set forth herein.

E.     Each Seller has determined that it is advisable and in the best interests of its estate and the beneficiaries of its estate to seek approval of this transaction from the Bankruptcy Court and to consummate the transactions provided for herein.

F.     Both ITS and the Diverse Debtors have obtained approval from the Bankruptcy Court of a joint sale procedure. On November 19, 2015, the Bankruptcy Court entered in the ITS Case an *Order Granting Debtor's Motion to Establish Bid Procedures and to Sell Certain Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests Pursuant to 11 U.S.C. § 363 and to Assume and Assign Executory Contracts and Leases (Dkt. No. 259)* as supplemented by docket no. 281 ("ITS Sales Procedures Order") approving a sales procedure for the assets of ITS. On the same day, the Bankruptcy Court entered in the Diverse Cases an *Order Granting Debtors' Motion to Establish Bid Procedures and to Sell Certain Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests Pursuant to 11 U.S.C. § 363 and to Assume and Assign Executory Contracts and Leases (Dkt. No. 212)* as supplemented by docket no. 265 ("Diverse Sales Procedures Order") approving a sales procedure for the assets of Diverse and Rouly. The ITS Sales Procedure Order and the Diverse Sales Procedures Order dovetail and provide for a sale of the assets of ITS, Diverse and Rouly as a part of a single sales procedure. This Agreement is executed in accordance with the ITS Sales Procedure Order and Diverse Sales Procedures Order.

G.     National Oil Well Varco, L.P. ("NOV") is a secured lender to the Diverse Debtors.  Purchaser has reached agreement with NOV that, contemporaneously with the Closing, Purchaser will acquire any claims that NOV has to equipment that is held by the Diverse Debtors and claims of NOV against Sellers.

H.     Fountain Leasing 2013 LP ("Fountain") is a secured lessor to the Diverse Debtors.  Purchaser has reached agreement with Fountain that, contemporaneously with the Closing, Purchaser will acquire from Fountain the equipment that Fountain currently leases to the Diverse Debtors, and as a result the Diverse Debtors will reject the Master Lease Agreement, dated February 12, 2014, between Diverse and Fountain, along with any schedules or other Contracts relating thereto.

I.     Nations Fund I, LLC ("Nations") is a secured lessor to the Diverse Debtors.  Purchaser has reached agreement with Nations that, immediately prior to the Closing, the parties will amend and restate (the "Amended and Restated Agreement") the Master Lease Agreement (and any schedules thereunder), dated December 29, 2014, between Diverse and Nations.  The Amended and Restated Agreement will become effective at the Closing, and will be assigned to and assumed by Purchaser.

J.     Grand Bank of Texas ("Grand") is a secured lessor to the Diverse Debtors.  Purchaser has reached agreement with Grand that, contemporaneously with

- 2 -

the Closing, Purchaser will acquire from Grand the equipment that Grand currently leases, indirectly through Integral Equipment Leasing, LLC, to the Diverse Debtors, and as a result the Diverse Debtors will reject the Master Lease Agreement, between Diverse and Integral Equipment Leasing, LLC, along with any schedules or other Contracts relating thereto.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

## ARTICLE I. - ACQUIRED ASSETS

**Section 1.1    Acquired Assets.**  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will (or will cause one of its designated affiliates to) purchase and acquire from Sellers, and Sellers will sell, transfer, convey, assign and deliver ("Convey") to Purchaser (or its designated affiliate), all of Sellers' right, title and interest in, to and under the Acquired Assets, free and clear of all Liens other than Permitted Encumbrances.  The term "Acquired Assets" means all of the Sellers' business, assets, properties, contractual rights, goodwill, going concern value, rights and claims used or held for use in their respective business (other than Excluded Assets), including the Diverse Acquired Assets, ITS Acquired Assets and Rouly Acquired Assets.  For the avoidance of doubt, while specific assets of Diverse, ITS and Rouly are itemized below, (a) such listing is not exclusive and is for illustrative purposes only and (b) all Acquired Assets held by Diverse Texas, Scribner, ITS Water and Acquisition Financing Group, if any, will also be Conveyed to Purchaser (or its designated affiliate) at the Closing.  For the avoidance of doubt, Sellers will not be deemed to have transferred any assets that are not otherwise owned by Sellers, including any property owned by third parties and held by Sellers pursuant to a bailment or consignment arrangement (although control of such assets will transfer to Purchaser for disposition pursuant to such arrangement).

**Section 1.2    Diverse Assets.**  On the terms and subject to the conditions set forth in this Agreement, Diverse will Convey to Purchaser (or its designated affiliate), and Purchaser (or its designated affiliate) will purchase, all of Diverse' s right, title and interest in and to all of the assets, properties and rights of Diverse (collectively the "Diverse Acquired Assets"), other than Excluded Assets, free and clear of all mortgages, liens, security interests, encumbrances, claims, pledge, deedpledges, deeds of trust, claim, lease, option, rightleases, options, rights of first refusal, easementeasements, transfer restrictionrestrictions, charges and restrictions of any kind or character ("Liens"), except for the Permitted Encumbrances, including the following Diverse Acquired Assets:

(a)    Equipment.  All equipment (collectively the "Diverse Equipment"), including all spare and replacement parts, and all warranties from any manufacturer, described in the attached Schedule 1.2(a);

- 3 -

(b)   <u>Inventory</u>.   All Inventory (collectively the "<u>Diverse Inventory</u>"), including Inventory described in the attached Schedule 1.2(b);

(c)   <u>Rental Equipment</u>.  All rental equipment, including as described in the attached Schedule 1.2(c), which is leased to third parties or held by Diverse for that purpose (collectively the "<u>Rental Equipment</u>");

(d)   <u>Real Estate</u>.  All real property interests in the land ("<u>Diverse Real Estate</u>") described in the attached Schedule 1.2(d);

(e)   <u>Furniture/Fixtures</u>.   All furniture and fixtures (collectively the "<u>Diverse Furniture</u>"), including as described in the attached Schedule 1.2(e);

(f)   <u>Contracts</u>.   The Contracts ("<u>Purchased Contracts</u>") to the extent expressly identified in the attached Schedule 1.2(f), including any Master Service Agreements and customer accounts listed therein, and any contracts of ITS and any other Diverse Debtor, in each case to the extent not rejected by Sellers or designated as Excluded Assets by Purchaser pursuant to <u>Section 1.9</u>;

(g)   <u>Real Estate Lease Agreements</u>.  The real estate leases ("<u>Diverse Real Estate Leases</u>") described in the attached Schedule 1.2(g), in each case to the extent not rejected by Seller or designated as Excluded Assets by Purchaser pursuant to <u>Section 1.9</u>;

(h)   <u>Equipment Leases</u>.  Diverse's rights pursuant to equipment leases ("<u>Equipment Leases</u>") described in the attached Schedule 1.2(h), including any Master Equipment Leases in which Diverse is the lessee, in each case to the extent not rejected by Seller or designated as Excluded Assets by Purchaser pursuant to <u>Section 1.9</u>;

(i)   <u>Intellectual Property</u>.  All Intellectual Property ("<u>Diverse Intellectual Property</u>"), including as described in the attached Schedule 1.2(i), which includes all names, trademarks, licenses, software licenses and other intellectual property, including without limitation all proprietary designs and manufacturing techniques and all other proprietary knowledge; and

(j)   <u>Accounts</u>.   All Accounts (collectively the "<u>Diverse Accounts</u>"), including those described in the attached Schedule 1.2(j), excluding any Accounts owed by ITS or any of the Diverse Debtors).

**Section 1.3   <u>ITS Assets</u>**. On the terms and subject to the conditions set forth in this Agreement, ITS will Convey to Purchaser (or its designated affiliate), and Purchaser (or its designated affiliate) will purchase, all of ITS's right, title and interest in and to all of the assets, properties and rights of ITS (collectively the "<u>ITS Acquired Assets</u>"), other than Excluded Assets, free and clear of all Liens, except for the Permitted Encumbrances, including the following ITS Acquired Assets:

- 4 -

(a)    Equipment.    All equipment (collectively the "ITS Equipment"), including all spare and replacement parts, and all warranties of any manufacturers, described in the attached Schedule 1.3(a);

(b)    Inventory.  All Inventory (collectively the "ITS Inventory"), including Inventory described in the attached Schedule 1.3(b);

(c)    WIP.    The WIP (collectively the "ITS WIP") described in the attached Schedule 1.3(c);

(d)    Furniture/Fixtures.    All furniture and fixtures (collectively the "ITS Furniture"), including as described in the attached Schedule 1.3(d);

(e)    Intellectual Property.    All Intellectual Property ("ITS Intellectual Property"), including as described in the attached Schedule 1.3(e), which includes all names, trademarks, licenses, software licenses and other intellectual property, including without limitation all proprietary designs and manufacturing techniques and all other proprietary knowledge;

(f)    ITS Options.    Any option held by ITS to acquire any real or personal property ("ITS Option Rights"), including as described in the attached Schedule 1.3(f); and

(g)    Accounts.  All Accounts (collectively the "ITS Accounts"), including those described in the attached Schedule 1.3(g), but excluding any Accounts owing by the Diverse Debtors to ITS.

**Section 1.4    Rouly Assets.**    On the terms and subject to the conditions set forth in this Agreement, Rouly will Convey to Purchaser (or its designated affiliate), and Purchaser (or its designated affiliate) will purchase, all of Rouly's right, title and interest in and to all of the assets, properties and rights of Rouly (collectively the "Rouly Acquired Assets"), other than Excluded Assets, free and clear of all Liens, except for the Permitted Encumbrances, including the following Rouly Acquired Assets:

(a)    Equipment.    All equipment (collectively the "Rouly Equipment"), including all spare and replacement parts, and all warranties of any manufacturers, described in the attached Schedule 1.4(a);

(b)    Inventory.  All Inventory (collectively the "Rouly Inventory"), including Inventory described in the attached Schedule 1.4(b);

(c)    Furniture/Fixtures.    All furniture and fixtures (collectively the "Rouly Furniture"), including as described in the attached Schedule 1.4(c);

- 5 -

(d)   Real Estate.   All real property interests in the land ("Rouly Real Estate") described in the attached Schedule 1.4(d);[1]

(e)   Intellectual Property.   All Intellectual Property ("Rouly Intellectual Property"), including as described in the attached Schedule 1.4(e), which includes all names, trademarks, licenses, software licenses and other intellectual property, including all proprietary designs and manufacturing techniques and all proprietary knowledge; and

(f)   Real Estate Lease Agreements.   The real estate leases ("Rouly Real Estate Leases") described in the attached Schedule 1.4(f), in each case to the extent not rejected by Seller or designated as Excluded Assets by Purchaser pursuant to Section 1.9;

**Section 1.5   Other Acquired Assets.**   Acquired Assets will also include any of the following held by or on behalf of a Seller (to the extent not Excluded Assets):[2]

(a)   Equipment.   The equipment described on Schedule 1.5(a), which is currently subject to the various Equipment Leases pursuant to which Grand Bank of Texas, Nations Fund I, LLC, Fountain Leasing 2013 LP and Integral Equipment Leasing, LLC (collectively the "Equipment Lessors") lease such equipment to Sellers (such equipment, the "Leased Equipment");

(b)   Katy Texas Property.   Either, at Purchaser's election, (i) all assets currently subject to (A) the agreement entitled Equipment Lease dated September 3, 2013 between FWT Leasing Company and ITS and (B) the real property subject to the Commercial Lease Agreement dated September 1, 2013 between Spunky Flat Land Company and ITS (collectively the "Katy Texas Property and Equipment" or (ii) a new lease by and between Purchaser and the respective lessors relating to the real property of such Katy Texas Property and Equipment in form and substance reasonably satisfactory to Purchaser;

(ca)   Deposits.   All deposits (including Customer Deposits and security deposits for rent, electricity, telephone or otherwise) and prepaid charges and expenses of Sellers related to the Business, in each case to the extent assignable to Purchaser ("Deposits");

(db)   Employee Benefits.   All deposits, in trust or otherwise, with respect to any employee benefit plan, including any 401(k) plan;

---

[1]   **Note to Draft:**  Purchaser is willing to transfer the Hobbs, New Mexico property to Alerus Financial, N.A., following the Closing for a nominal amount.

[2]   **Note to Draft:**  Parties to discuss treatment of Bank Accounts that customers pay directly to as this will continue following the Closing.  Any amounts paid to such accounts are property of Purchaser; it will be simpler to transfer ownership of such accounts to Purchaser.

(e)     Insurance.  All rights under or arising out of all insurance policies relating to the Business or the Acquired Assets, unless non-assignable as a matter of law;

(fc)     Books and Records.  All documents and books and records, of the Business, including relating to products, services, marketing, advertising, personnel files for Transferred Employees and all files, customer files, supplier lists, records, literature and correspondence ("Books and Records"); and

(gd)     Causes of Action.   Unless otherwise expressly set forth in this Agreement, all rights, claims or causes of action of Sellers against third parties relating to the Acquired Assets or Assumed Liabilities (other than Avoidance Actions), including those arising out of events occurring prior to the Closing Date and claims against any (i) customer of the Business, (ii) any vendor or supplier  of the Business, or (iii) any Transferred Employee,; provided hoever, however, this paragraph (ge) does not apply to any Avoidance Actions.

        Section 1.6     Excluded Assets.  Nothing contained in this Agreement will be deemed to constitute an agreement to Convey the Excluded Assets to Purchaser, and Sellers will retain all right, title and interest to, in and under the Excluded Assets. The term "Excluded Assets" means:

        (a)     cash, cash equivalents, cash proceeds, and all funds held in any bank or deposit account of a Seller as of the Business Day prior to the Closing Date;

        (b)     taxpayer and other identification numbers, minute books, stock transfer books, stock certificates, stock records, and other documents relating to the organization maintenance, and existence of Sellers;

        (c)     Avoidance Actions;

        (d)     any Contracts, except for the Purchased Contracts;

        (e)     taxpayer or other similar identification numbers of Sellers;

        (f)     any equity interests in any Person, including any Seller or ITS Water or AFG;

        (g)     any claim, right, or interest of Sellers in or to any refund, rebate, abatement, or other recovery for Taxes for periods 2014 and prior;

        (h)     Sellers' rights under any insurance policies or rights to proceeds thereof relating to the Excluded Assets;

        (i)     any indebtedness (including, any Accounts) owed by one Seller to any of the other Sellers or any related entity;

- 7 -

(j)     any claim by one Seller against any of the other Sellers or their respective affiliates;

(k)     the items specifically set forth on Schedule 1.5(k);[3]

(kl)    all claims or causes of action against Spunky Flat Land Company, FWT Leasing Company, Charles Shook, Sloan & Moyer and ITS (US) Holdings, Inc., and other third parties other than any (i) customer of the Business, (ii) any vendor or supplier of the Business, or (iii) any Transferred Employee; provided, however, this paragraph (k) does not apply to any Avoidance Actions; and

(lm)    all malpractice or similar claims by any of SellersSeller against any professionals, including all legal malpractice claims.  Without limiting the generality of the foregoing, this shall include without limitation all malpractice claims by any of SellersSeller against David Sloan and the firm of Sloan & Moyer, Houston, Texas.

**Section 1.7    Assumed Liabilities.**  Except for (a) Customer Deposits expressly identified on Schedule 1.7, (b) all due and owing accounts payable with respect to Acquired Assets that were incurred by Sellers in the ordinary course of business subsequent to the filing of their respective bankruptcy cases through the date prior to the Closing Date not to exceed the sum of $400,000.00 in the aggregate, (c) all Transfer Taxes with respect to Acquired Assets that may be owing to any Governmental Body arising or relating to the transactions contemplated by this Agreement, (d) all obligations under each of the Purchased Contracts to the extent arising out of post-Closing obligations, and (e) all property taxes assessed against the Acquired Assets for the tax year 2016 (collectively the "Assumed Liabilities"), which obligations shall be assumed by Purchaser at Closing, Purchaser (and any of its affiliates) shall not assume by virtue of this Agreement, or the transactions contemplated hereby, and shall have no liability for, any liabilities of any Seller.  The term "Transfer Tax" means any sales, use, bulk transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, or based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.  "Assumed Liabilties" will mean only the following liabilities of Sellers:

(a)     Customer Deposits to the extent expressly identified on Schedule 1.7;

(b)     all due and owing accounts payable that were incurred by Sellers in the ordinary course of business subsequent to the filing of their respective

---

[3]   **Note to Draft:** Schedule to list Odessa lease, Titan equipment, Katy facility lease agreement, FWT equipment (and related lease agreement), New Mexico real property lease, Fountain equipment (and related lease agreement) and Grand Bank / Integral equipment (and related lease agreement) (Fountain and Grand Bank / Integral equipment will be purchased directly from such parties).

bankruptcy cases through the date prior to the Closing Date to the extent expressly identified on Schedule 1.7, not to exceed the aggregate cap amount set forth on Schedule 1.7;

(c)     all Transfer Taxes with respect to Acquired Assets that may be owing to any Governmental Body arising or relating to the transactions contemplated by this Agreement;

(d)     all obligations under each of the Purchased Contracts to the extent arising out of post-Closing obligations;

(e)     the Cure Costs with respect to Purchased Contracts;

(f)     all property taxes assessed against the Acquired Assets for the tax years 2015 and 2016 to the extent expressly identified on Schedule 1.7, not to exceed the aggregate cap amount set forth on Schedule 1.7;

(g)     all accrued and unpaid salaries and salary related taxes, benefits, accrued commissions, and expense reimbursables as of the Closing for all of the Transferred Employees to the extent expressly identified on Schedule 1.7, not to exceed the aggregate cap amount set forth on Schedule 1.7;

(h)     sales taxes owing to any governmental entity for any period prior to the filing of Sellers' respective bankruptcy petitions to the extent expressly identified on Schedule 1.7, not to exceed the aggregate cap amount set forth on Schedule 1.7;

(i)     amounts that may be owing to Ally to the extent expressly identified on Schedule 1.7, not to exceed the aggregate cap amount set forth on Schedule 1.7; and

(j)     all sales taxes owing to any governmental entity collected by Purchaser subsequent to the Closing, as part of accounts receivable collections with respect to Acquired Assets.

**Section 1.8     Excluded Liabilities**.  Purchaser will not assume and will be deemed not to have assumed, and Sellers will remain liable with respect to, any liabilities of Sellers other than the Assumed Liabilities (such other liabilities, the "Excluded Liabilities"), including:

(a)     all liabilities arising out of Excluded Assets;

(b)     all liabilities of any Seller arising under this Agreement; and

(c)     any liability arising out of or related to the Acquired Assets or the Business related to facts or actions occurring or accruing prior to the Closing that is not expressly included among the Assumed Liabilities.

- 9 -

**Section 1.9**    **Identification of Additional Excluded Assets**.  Notwithstanding anything in this Agreement to the contrary, at any time prior to the date that is ~~five Business Days prior to~~30 days following the Closing Date, Purchaser will be entitled, in its sole discretion, to designate any Acquired Asset, including any Purchased Contract, as an Excluded Asset, by providing written notice thereof to Sellers.    Sellers acknowledge and agree that Purchaser and its affiliates will not be responsible for or otherwise assume or have any obligation for any liabilities associated with or related to or arising under any such asset, including any such Contract, designated as an additional Excluded Asset in accordance with the foregoing.  Without any further action on the part of Sellers or their respective successors, the transfer of such Acquired Assets (and assumption of any related liabilities with respect thereto) will be deemed null and void ab initio and Sellers will be deemed to have retained all liabilities with respect thereto.[4]   In the event Purchaser timely designates any Acquired Asset or Purchased Contract as an Excluded Asset pursuant to the terms of this Section 1.9, such designation does not change the Purchase Price owing by Purchaser or liability of Purchaser with respect to any Assumed Liability described in clauses (a), (b), (c) or (f) – (j) of the definition of "Assumed Liabilities."

**Section 1.10**   **Permitted Encumbrances**.    The following shall constitute permitted encumbrances (collectively the "Permitted Encumbrances") to the sale of the Acquired Assets:

(a)    property Taxes assessed against the Acquired Assets for ~~all~~ tax years 2015 and 2016;[5]

~~(b)    the interests of lenders in the property subject to the following financing statements filed with the Secretary of State of North Dakota:~~

~~(i)    the collateral subject to file no. 12-000754556-3 and file no. 12-000757613-7 filed by Coactive Capital Partners, respectively, on June 20, 2012 and July 5, 2012;~~

~~(ii)    the collateral subject to file no. 12-000776381-8 filed by CNB Capital America, LLC on October 16, 2012; and~~

~~(iii)    the collateral subject to file no. 14-000912141-2 filed by Natural Oil Well Varco, L.P. on May 22, 2014.~~

(~~e~~b)    as to the Diverse Real Estate, the matters set forth in the attached Schedule 1.10(c) and other matters filed in the real property records relating to the Diverse Real Estate; and

---

[5]   **Note to Draft:**  Equipment purchased from Titan and financed by CNH Capital will remain with the estate.

(d~c~)    as to the Rouly Real Estate, the matters set forth in the attached Schedule 1.10(d) and other matters filed in the real property records relating to the Rouly Real Estate.

**Section 1.11 <u>Condition of Acquired Assets</u>**. The Acquired Assets are all sold and transferred by Sellers to Purchaser "AS IS, WHERE IS," "WITH ALL FAULTS." Sellers make no warranty, either express or implied, as to the Acquired Assets, including without limitation any warranty of merchantability or fitness for any particular purpose of any of the Acquired Assets, and all such warranties are hereby expressly disclaimed and negated except for the warranties in <u>Article III</u>. In purchasing the Acquired Assets, Purchaser hereby acknowledges to, and represents and warrants to, Sellers, that in purchasing the Acquired Assets pursuant to this Agreement: (a) Purchaser is solely and exclusively relying upon its own due diligence, inspection and assessment of the Acquired Assets; (b) Purchaser is not relying upon any statement, representation or warranty of Sellers, except as expressly set forth herein; and (c) Purchaser acknowledges that, the acknowledgements and representations contained in this <u>Section 1.11</u> are a material inducement for Sellers to enter into this Agreement and that Sellers would not have entered into this Agreement but for such acknowledgements and warranties.

**Section 1.12 <u>Real Estate Warranties of Title</u>**. Purchaser shall receive a special warranty of title as to any real estate included in the Acquired Assets warranting title against claims by, through and under such Seller, but not otherwise.

**Section 1.13 <u>Assets of AFG and ITS Water</u>**.  Prior to the Closing, Sellers will and will cause each of AFG and ITS Water to transfer any and all assets held by AFG or ITS Water, other than equity in any entity and cash or funds in any financial institution, to a Seller so that such assets are included as Acquired Assets as applicable.

<u>**ARTICLE II. - PURCHASE PRICE AND CLOSING**</u>

**Section 2.1    <u>Purchase Price</u>**.   The aggregate consideration for the Acquired Assets will be equal to the assumption of the Assumed Liabilities <u>plus</u> an amount in cash equal to $~~6,500,000.00 minus the amount of any Cure Costs payable by Purchaser pursuant to Section 2.3 to the extent exceeding $250,000 in the aggregate~~<u>5,450,000</u> (the "<u>Purchase Price</u>"), and <u>the Purchase Price less the Trust Deposit</u> will be paid on the Closing Date to the account(s) designated by Sellers in writing to Purchaser at least two Business Days prior to Closing.

**Section 2.2    <u>Liability for Taxes</u>**.   Purchaser shall pay all property taxes assessed against the Acquired Assets for the tax ~~year~~<u>years 2015 and</u> 2016.

**Section 2.3    <u>Cure Costs</u>**.  ~~At Closing, (a)~~ Purchaser will pay to the appropriate Persons all amounts necessary to cure defaults under the Purchased Contracts, <u>to the extent ultimately assigned to Purchaser and not otherwise rejected under Section 1.9,</u> so as to permit~~, at the Closing,~~ the assumption and assignment of the Purchased

- 11 -

Contracts ~~hereunder~~ pursuant to Section 365 of the Bankruptcy Code ("Cure Costs")~~;~~ ~~provided that the amount payable by Purchaser under this Section 2.3 shall not exceed the amount that would reduce the Purchase Price to zero and (b) Sellers shall pay any additional Cure Costs as necessary to permit, at the Closing, the assumption and assignment of the Assumed Contracts and the Assumed Leases hereunder pursuant to Section 365 of the Bankruptcy Code.~~.

**Section 2.4    Deposit**. ~~Concurrently with~~Prior to the execution hereof, Purchaser has deposited the sum of two hundred fifty thousand and No/100 dollars ($250,000) into a trust account designated by Sellers as trust deposit (the "Trust Deposit"), to be credited to the Purchase Price at Closing.  Any interest on the Trust Deposit shall become part of the trust fund.

**Section 2.5    Closing**. The closing of the purchase and sale (the "Closing") provided for in this Agreement shall take place in accordance with the following terms:

(a)    Time of Closing. The Closing shall take place five Business Days following satisfaction or waiver of the conditions set forth in Article VI (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other time and place as the Parties may agree in writing (the date on which the Closing occurs, the "Closing Date"). At the Closing, Sellers shall Convey and surrender to Purchaser all of the Acquired Assets and Purchaser shall pay Sellers or Sellers' designee(s) the Purchase Price by wire transfer in immediately available funds to a United States account(s), which shall be designated in writing by Sellers to Purchaser no later than three Business Days prior to the Closing Date.  Unless otherwise agreed to by the Parties and the DIP lender, in no event shall the Closing Date occur after January ~~31~~29, 2016.

(b)    Location of Closing. The Closing contemplated by this Agreement will take place at the offices of Jones Day located at 2727 N. Harwood Street, Dallas, TX 75201.

(c)    Deliveries by Sellers.  At the Closing, Sellers will deliver, or cause to be delivered, to Purchaser:

(i)    one or more duly executed bills of sale in a form to be agreed upon by the Parties;

(ii)    one or more duly executed assignment and assumption agreements in a form to be agreed upon by the Parties;

(iii)    the officer's certificate required to be delivered pursuant to Section 6.1(b);

(iv)     affidavits executed by each Seller that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(v)      certified copies of the Bankruptcy Sale Orders;

(vi)     physical possession of all of the Acquired Assets;

(vii)    one or more special warranty deeds, in the form to be agreed upon by the Parties, executed and acknowledged by the applicable Seller. In the case of the Katy Texas Property and Equipment, either FWT Leasing Company and Spunky Flat Land Company conveying to Purchaser the Acquired Owned Property, including the Katy Texas Property and Equipment, or a new lease by and between Purchaser and the respective lessors relating to the real property of the Katy Texas Property and Equipment in a form reasonably satisfactory to Purchaser;;

(viii)   a waiver and release duly executed by the Persons set forth on Schedule 2.5(c)(viii)assignment to Purchaser or its designee of the personal guarantees that were issued to Alerus Financial, NA, or its affiliate, by Todd A. Hass and H. Roger Wagner, in a form to be agreed upon by the Partiesparties thereto;

(ix)     employment, consulting and/or noncompete agreements between the Persons set forth on Schedule 2.5(c)(ix) and Purchaser, in form and substance satisfactory to Purchaser;

(x)      certificates of titles for any vehicles or titled equipment included in the Acquired Assets, including the Leased Equipment, free and clear of Liens, duly endorsed by the applicable Seller (and in the case of the Leased Equipment, from the Equipment Lessors); and

(xi)     such bills of sale, special warranty deeds, endorsements, assignments, UCC terminations and other filings and other good and sufficient instruments, in form reasonably satisfactory to Purchaser, as Purchaser may reasonably request to vest in Purchaser all the right, title and interest of Sellers in, to or under any or all of the Acquired Assets free and clear of Liens other than Permitted Encumbrances.

(d)     Deliveries by Purchaser.  At the Closing, Purchaser will deliver, or cause to be delivered, to Sellers:

- 13 -

(i)     the cash payment in accordance with <u>Section 2.1</u>;

(ii)    ~~to the Persons contemplated by Section 2.3, the Cure Costs payable by Purchaser pursuant to Section 2.3;~~

(~~iii~~<u>ii</u>)   countersignature to one or more duly executed assignment and assumption agreements in a form to be agreed upon by the Parties;

(~~iv~~<u>iii</u>)   the officer's certificate required to be delivered pursuant to <u>Section 6.2(a)</u>; and

(~~v~~<u>iv</u>)   such assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to transfer and assign the Acquired Assets and Assumed Liabilities to Purchaser.

(e)     <u>Removal of Acquired Assets</u>.  If Purchaser is not acquiring or leasing the real estate on which any Acquired Assets are located, then Purchaser shall have a period of ~~30~~<u>60</u> days from the Closing Date to remove such Acquired Assets; <u>provided</u>, that Sellers shall have no responsibility for any of the Acquired Assets following the Closing.  The removal of such Acquired Assets shall be at Purchaser's sole cost and risk.

**Section 2.6    Further Assurance; Post-Closing Cooperation**.    The Parties agree, at and after the Closing ~~Date~~, (a) to furnish upon request to each other such further information as may be reasonably necessary or appropriate, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other Parties may reasonably request for the purpose of carrying out the intent of this Agreement and fully consummating and performing the transactions contemplated herein. In addition, for a period of 90 days after the Closing, Sellers shall be entitled to reasonable assistance from Diverse's accounting staff that are Transferred Employees to assist in the wind-up of Sellers' accounting and business.  Sellers shall reimburse Purchaser for the services of such accounting personnel based on a reasonable hourly rate directly tied to the compensation paid to such members of the accounting staff by Purchaser.  Additionally, for a period of two years following the Closing, Sellers, their professionals, and other authorized representatives of the bankruptcy estate shall have access to the Books and Records during normal business hours and upon reasonable notice to Purchaser and without interference with Purchaser's business, to obtain information to allow Sellers to windup their respective affairs and to administer their respective bankruptcy estates.

**Section 2.7    Allocation of Purchase Price**. Purchaser and Sellers shall mutually agree to the allocation, prepared in accordance with Section 1060 of the Code and the Treasury Regulations thereunder, of the Purchase Price among the Acquired Assets. Purchaser and Sellers shall use the asset values allocation mutually determined

- 14 -

by Purchaser and Sellers for purposes of all tax returns. Sellers and Purchaser shall cooperate in the preparation and filing of any necessary tax forms and tax returns to ensure consistency with the allocation provided in this Agreement; provided, however, the allocation for Tax purposes shall not be binding upon ~~the~~ Purchaser or any of Sellers' respective bankruptcy estates or any secured creditor holding or claiming a Lien against any of the Acquired Assets. For removal of any doubt, the allocation of the Purchase Price shall not be binding upon Sellers in determining the manner in which the Purchase Price is to be allocated as among the ITS and Diverse Debtors' respective bankruptcy estates or the manner in which the Purchase Price will be allocated to the secured claim of any secured creditor. This allocation, as among Sellers' various bankruptcy estates or with respect to the secured claim of any secured creditors, shall be established by the Bankruptcy Court as a part of the ITS Case and the Diverse Cases.

## ARTICLE III.- REPRESENTATIONS AND WARRANTIES OF SELLERS

The representations and warranties set forth in this <u>Article III</u> are made to Purchaser by each Seller relating to their respective entities, on a several and not a joint basis, as follows:

**Section 3.1** **Due Organization and Good Standing**.  Each Seller is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its organization, subject to the limitations imposed on such Seller as a result of having filed a petition for relief under the Bankruptcy Code.  Each Seller has, as applicable, the requisite corporate or limited liability company power and authority to own, lease and operate its properties and to carry on its business as currently conducted.  Each Seller is duly qualified or licensed to do business in each jurisdiction such qualification or licensing necessary for the operation of the Business as currently conducted, except where the failure to be so qualified would not reasonably be expected to be material.

**Section 3.2** **Authorization; Enforceability**.  Subject to entry of Bankruptcy Sale Orders in both the ITS Case and Diverse Cases and any such other authorization or approval as are required by the Bankruptcy Court, each Seller has, as applicable, the requisite corporate or limited liability company power and authority necessary to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate or limited liability company action, as applicable, on the part of each Seller. Each Seller believes that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court, a sale, transfer and assignment of the Acquired Assets to Purchaser pursuant to this Agreement under Sections 105 and 363 of the Bankruptcy Code is in the best interests of such Seller and its creditors.

- 15 -

**Section 3.3     Financial Statements**.

(a)     Complete copies of the unaudited financial statements consisting of the consolidated balance sheet of Diverse Texas and its subsidiaries as of December 31, 2014 and the related income statement and statement of cash flow for the year then ended (the "2014 Financial Statements"), and the unaudited financial statements consisting of the consolidated balance sheet of Diverse Texas and its subsidiaries as of September 30, 2015 and the related income statement and statement of cash flow for the nine-month period then ended (the "Interim Financial Statements" and, together with the 2014 Financial Statements, the "Financial Statements") are set forth on Schedule 3.3(a).

(b)     Schedule 3.3(b) sets forth the back-log of each Seller as of November 30, 2015 setting forth the applicable (i) customer, (ii) order date, and (iii) order amount.   The back-log for each Seller represents bona fide orders under Contracts that were made in the ordinary course, but some of the orders may not have firm delivery dates and Sellers do not believe any of their orders have been cancelled.

**Section 3.4     Litigation**.   Except for the ITS Case, the Diverse Cases and pleadings, complaints and motions that have been filed or may be filed therein, there is no Legal Proceeding or Order pending, outstanding or, to the Knowledge of Sellers, threatened against any Seller that seeks to restrain or prohibit or otherwise challenge the consummation, the legality or validity of the transactions contemplated hereby.

**Section 3.5     Title to Acquired Assets; Sufficiency**.   Subject to the entry of the Bankruptcy Sale Order, Sellers own the Acquired Assets ~~(except for potentially the Katy Texas Property and Equipment)~~ and Seller shall provide a special warranty deed to such Acquired Assets, free and clear of all Liens (including any and all prepetition and postpetition adequate protection Liens of Sellers' prepetition lenders) other than (a) Liens created by the Purchaser, (b) Permitted Encumbrances and (c) Liens expressly assumed by Purchaser (or its designated affiliate or affiliates) as Assumed Liabilities under this Agreement.   Neither AFG nor ITS Water hold any assets that are used in the Business.

**Section 3.6     Tax Matters**.   There are no Liens for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

**Section 3.7     Intellectual Property**.   Schedule 3.7 sets forth a complete and accurate list of all material Acquired Intellectual Property to the Knowledge of Sellers, Sellers own or have valid licenses to use all Acquired Intellectual Property.   Except for any Excluded Assets and claims for Intellectual Property made by COR Thermotics, LLC, the Acquired Intellectual Property comprises all of the Intellectual Property necessary for the operation of the Business as currently conducted.   The Acquired Intellectual Property is subsisting, in full force and effect, and has not been cancelled, abandoned, expired or otherwise terminated.   To the Knowledge of Sellers, no Person is infringing, violating or misappropriating any of the Acquired Intellectual Property owned by Sellers in any material respect.   As of the date of this Agreement, there is no

- 16 -

pending claim, demand, or proceeding challenging the validity, enforceability or ownership of, or the right to use, any of the Acquired Intellectual Property and, to the Knowledge of Sellers, there is no such threatened claim, demand or proceeding, other than claims made by COR Thermotics, LLC.

### Section 3.8  Employee Benefits/Labor.

(a)  Sellers have provided Purchaser with (i) a list of all employees of Sellers, including all salaries and positions of such individuals and (ii) copies or summaries of all material employee benefit plans and arrangements, including all bonus or other incentive plans, compensation, severance pay, sick leave, vacation pay, disability, medical, and life insurance.

(b)  Except as otherwise contemplated or provided for under the terms of this Agreement, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any Transferred Employee (other than accrued vacation), (ii) increase any benefits otherwise payable under any employee benefit plan, or (iii) result in the acceleration of the time of payment or vesting of any such benefits.

(c)  Except as set forth on Schedule 3.8(c), no Seller, nor any of their respective subsidiaries, is a party to any labor or collective bargaining agreement.

### Section 3.9  Environmental and Health and Safety Matters.  Except as set forth on Schedule 3.9:

(a)  to the Knowledge of Sellers, the current operations of the Business comply with all applicable Environmental Laws, and Sellers have not received written notice alleging that the activities of the Business are in violation of any Environmental Laws;

(b)  to the Knowledge of Sellers, there has been no, Release of any Hazardous Substances at or in the vicinity of any property currently or formerly owned, leased or used by any Seller that requires reporting under applicable Environmental Laws;

(c)  no Seller has entered into or been subject to any consent decree, compliance order or administrative order with respect any Environmental Condition or received any written request for information, notice, demand letter, administrative inquiry or complaint or claim with respect to any Environmental Condition or any Environmental Laws;

(d)  to the Knowledge of Sellers, no Seller has assumed, undertaken or otherwise become subject to any liability of any other Person relating to or arising from any Environmental Laws; and

- 17 -

(e)     Sellers have delivered, or caused to be delivered, to Purchaser copies of all documents, records and information in its possession or control concerning Environmental Conditions, including previously conducted environmental site assessments, compliance audits, asbestos surveys and documents regarding any Release of Hazardous Substance at, upon or from any property currently or formerly owned, leased or used by any Seller, and environmental agency reports and correspondence.

**Section 3.10   Compliance with Laws; Permits**.   To the Knowledge of Sellers, each Seller (a) is, and since the date two years prior to the date of this Agreement has been, in compliance with all, and not subject to any liability pursuant to any, laws applicable to the operation of the Business, except where the failure to be in compliance would not reasonably be expected to be material, and (b) has all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not reasonably be expected to be material to the Business.

**Section 3.11   Major Customers**.   Schedule 3.11 sets forth a true and correct list of the ten largest customers of the Business (by dollar volume of sales) during each of the calendar years ended December 31, 2013 and December 31, 2014 and for the nine-months ended September 30, 2015 (the "Major Customers") and the amount for which each such customer was invoiced by Sellers during such periods.   To the Knowledge of Sellers, Sellers have received no written notice that any Major Customer, and to the Knowledge of Sellers, no Major Customer, intends to cease engaging the services of the Business, or intends to alter the use of such services, after the Closing except potentially Dominion Transmission, Inc.

**Section 3.12   Major Suppliers**.   Schedule 3.12 sets forth a true and correct list of the ten largest suppliers from which any Seller ordered raw materials, supplies, merchandise and other goods for the Business (by dollar volume of purchases) during each of the calendar years ended December 31, 2013 and December 31, 2014 and the nine-months ended September 30, 2015 (the "Major Suppliers"), and the amount paid to each such supplier by Sellers during such periods.

**Section 3.13   Contracts**.   Each Purchased Contract is a valid and binding obligation of the applicable Seller party thereto and, to the Knowledge of Sellers, the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by (a) bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity).   To the Knowledge of Sellers, no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any such Contract or would cause the acceleration of any obligation of any Seller or, to the Knowledge of Sellers, any other party thereto or the creation of a Lien upon any Acquired Asset.

**Section 3.14   Real Property**.

- 18 -

(a)     Schedule 3.14(a) sets forth a list of the Acquired Real Property. The Acquired Real Property constitutes all interests in real property which are necessary for the continued operation of the Business as currently conducted.

(b)     Schedule 3.14(b) sets forth a true and complete list of all real property leases, subleases or other agreements (each lease, sublease or other agreement, including all amendments thereto, a "Real Property Lease") under which any Seller has a leasehold or subleasehold estate or otherwise uses or occupies or has the right to use or occupy any real property (such property subject to such Real Property Leases, collectively the "Leased Real Property") and, for each parcel of Leased Real Property, identifies the street address and such Seller that is the lessee or sublessee of such Leased Real Property.  Sellers have delivered or made available to Purchaser true and complete copies of all Real Property Leases, including all amendments, modifications, extensions and guaranties relating thereto.

(c)     Subject to entry of the Bankruptcy Sale Orders, Sellers have valid fee simple title to the Acquired Owned Property, free and clear of all Liens, except for Permitted Encumbrances.  Sellers have delivered or made available to Purchaser true and complete copies of all warranty deeds and other documents relating to the Acquired Owned Property.

(d)     To the Knowledge of Sellers, there is no pending condemnation, eminent domain proceeding or like legal proceeding, or sale or other disposition in lieu of condemnation by any Governmental Body affecting the Acquired Real Property or any part thereof.

Section 3.15   **Financial Advisors**.  No Seller has any liability or obligation to pay any fees or commissions to any broker, finder or other similar agent with respect to the transactions contemplated by this Agreement for which Purchaser could become liable or obligated.

Section 3.16   **Condition of Acquired Assets**. Except for the representations and warranties contained in this Article III (as modified by the Schedules thereto), Sellers nor any other Person makes any other expressed or implied representation or warranty on behalf of any Seller with respect to the Acquired Assets, the Assumed Liabilities, the Business or the transactions contemplated by this Agreement.   The Acquired Assets are all sold and transferred by each Seller to Purchaser "AS IS, WHERE IS," "WITH ALL FAULTS."  Purchaser hereby acknowledges that in purchasing the Acquired Assets pursuant to this Agreement (a) Purchaser is solely and exclusively relying upon its own due diligence, inspection and assessment of the Acquired Assets, (b) Purchaser is not relying upon any statement, representation or warranty of any Seller, except as expressly set forth herein, and (c) Purchaser acknowledges that, the acknowledgements and representations contained in this Section 3.16 are a material inducement for Sellers to enter into this Agreement and that Sellers would not have entered into this Agreement but for such acknowledgements and warranties.

- 19 -

## ARTICLE IV.- REPRESENTATIONS AND WARRANTIES OF PURCHASER

The representations and warranties set forth in this <u>Article IV</u> are made to Sellers by Purchaser as follows:

**Section 4.1    Organization and Good Standing**.  Purchaser is an entity duly organized, validly existing and in good standing under the laws of the state of its incorporation and has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

**Section 4.2    Authorization of Agreement**.   Purchaser has the requisite corporate power and authority necessary to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder.   The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Purchaser.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered by Purchaser.  Assuming the due authorization, execution and delivery by the other Parties and the approval of the Bankruptcy Court, this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium and similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

**Section 4.3    Non-Contravention; Consents**.  No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by Purchaser of any other action contemplated hereby or thereby, except for such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make, would not, individually or in the aggregate, reasonably be expected to materially impair Purchaser's ability to consummate the transactions contemplated hereby.

**Section 4.4    Financial Advisors**.  Purchaser has no liability or obligation to pay any fees or commissions to any broker, finder or other similar agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated.

- 20 -

## ARTICLE V.- COVENANTS

**Section 5.1     Mutual Cooperation**.   Sellers and Purchaser shall reasonably cooperate with each other and use (and will cause their respective affiliates to use) their respective commercially reasonable efforts, to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable on their part under this Agreement and applicable laws, rules and regulations to consummate the transactions contemplated in this Agreement as soon as practicable, including preparing and filing as promptly as practicable all documentation to affect all necessary notices, reports and other filings, responding promptly to any requests for further information and to obtain as promptly as practicable all consents, registrations, approvals, Permits and authorizations necessary or advisable to be obtained from any Person in order to consummate the transactions contemplated in this Agreement as promptly as practicable. This shall include obtaining all necessary approvals or orders from the Bankruptcy Court in both the ITS Case and the Diverse Cases.

**Section 5.2     Notification of Certain Matters**. Sellers shall notify Purchaser of any matter that in any way materially affects the Acquired Assets, the ~~Businees~~Business (including  the termination of employment with any Seller by an employee of the Business, or the transactions contemplated by this Agreement, and (a) arises after the date hereof or (b) makes it necessary to correct any information in any Schedule to this Agreement or in any representation and warranty of any Seller that has been rendered materially inaccurate thereby.  Each such notification shall be made no later than two Business Days after discovery thereof and no later than three Business Days before the date set for the Closing by the Parties.

**Section 5.3     Conduct of Sellers Prior to Closing**.

(a)     Except as (i) set forth on Schedule 5.3(a), (ii) as required by applicable law, (iii) as otherwise expressly contemplated by this Agreement, or (iv) with Purchaser's prior written consent or the approval of the Bankruptcy Court (provided that no Seller shall petition, seek, request or move for any Order of the Bankruptcy Court approving or creating an exception on the obligations of Sellers set forth in this Section 5.3, or authorize, support or direct any other Person to petition, seek, request or move for any such Order), during the period from the date of this Agreement to and through the Closing Date, Sellers (x) will (A) conduct the Business only in the ordinary course and (B) use their commercially reasonable efforts excluding paying amounts that may be owing to customers and suppliers of the Business to (1) preserve the present business operations, organization and goodwill of the Business, including the preservation of the present employee base of the Business, and (2) preserve the present relationships with customers and suppliers of the Business; provided, however, that, subject to the above parenthetical, Sellers may act outside of the ordinary course as is required by the Bankruptcy Code and (y) will not, in connection with the Business:

(i)     directly or indirectly sell, license, convey, lease or otherwise transfer or offer, agree or commit (in writing or otherwise) to sell, license, convey, lease or otherwise transfer, any of the

- 21 -

Acquired Assets, other than the sales or use of any of the Acquired Assets in the ordinary course;

(ii)    permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien or claim;

(iii)    waive, release or assign any material rights or claims of any Seller that constitutes an Acquired Asset;

(iv)    enter, terminate or amend any Purchased Contract other than in the ordinary course;

(v)    institute, settle or agree to settle any material proceeding before any Governmental Body relating to the Acquired Assets;

(vi)    (A) increase the level of compensation of any employee, (B) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any employee, director or consultant, (C) increase the coverage or benefits available under any (or create any new) employee benefit plan or (D) terminate any employee; or

(vii)    enter into any transaction or take any other action that could be reasonably expected to cause or constitute a material breach of any representation or warranty made by Sellers in this Agreement

Notwithstanding any of the foregoing, Sellers shall be entitled to solicit offers to purchase the Acquired Assets in accordance with the ITS Sales Procedures Order and the Diverse Sales Procedures Order and consummate any such sale approved by order of the Bankruptcy Court.

**Section 5.4  Allocation of Expenses**.  Unless otherwise expressly set forth in this Agreement, Sellers are responsible for all expenses related to the Acquired Assets prior to the Closing Date, and Purchaser is responsible for all such expenses to the extent relating to ownership of such assets after the Closing Date.

**Section 5.5  Access and Investigation**.  From the date hereof until the Closing or, if earlier, the termination of this Agreement in accordance with its terms, and upon reasonable advance notice from Purchaser, Sellers will allow Purchaser and its representatives (including any potential debt financing sources) reasonable access during normal business hours and without unreasonable interference with the operation of the business of Sellers to (a) such materials and information about Sellers and the Business as Purchaser may reasonably request and (b) the properties, officers, directors, employees, accountants and financial advisors of Sellers as

- 22 -

Purchaser may reasonably request.  The foregoing will not (i) include access or information which Sellers are expressly prohibited by law from granting or disclosing or (ii) require Sellers take any action which would, in the advice of counsel, constitute a waiver of any legal privilege, including the attorney-client privilege or the attorney work product privilege.

## ARTICLE VI. - CONDITIONS TO CLOSING

**Section 6.1    Conditions to Obligations of Purchaser**. Purchaser's obligation to purchase the Acquired Assets and to take the other actions required to be taken by Purchaser at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived in writing by Purchaser, in whole or in part):

(a)    <u>Bankruptcy Sale Order</u>. Sellers shall have obtained the entry of Bankruptcy Sale Orders in both the ITS Case and the Diverse Cases providing for the sale of the Acquired Assets to Purchaser free and clear of all Liens, other than the Permitted Encumbrances, pursuant to the terms of this Agreement. The Bankruptcy Sale Orders shall be in form and substance reasonably satisfactory to Purchaser and, as of the date of Closing, shall not be subject to a stay by any court, shall be a Final Order, and shall provide such other relief as may be reasonably necessary or appropriate to allow for the consummation of the transactions contemplated by this Agreement.

(b)    <u>Representations, Warranties, and Covenants of Sellers</u>.  (i) Each of the representations and warranties made by Sellers in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date (as if made anew at and as of the Closing); and (ii) Sellers shall have performed and complied in all respects with all terms, agreements, and covenants contained in this Agreement required to be performed or complied with by Sellers on or before the Closing Date, and Purchaser shall have received a certificate signed by Todd Hass, Chief Financial Officer of each Seller, dated as of the Closing Date, to the foregoing effect.

(c)    <u>No Prohibition or Injunction</u>.  No provision of any applicable law and no order or proceeding shall be in effect that shall prohibit or restrict the consummation of the transactions contemplated by this Agreement, or that is reasonably likely to cause a material adverse change to any of the Acquired Assets or to cause the Purchaser or any of its affiliates to suffer any material adverse consequence under any applicable legal requirement or order.

(d)    ~~Consents and Approvals.  Sellers shall have obtained the consents and approvals identified on Schedule 6.1(d), in form and substance reasonably acceptable to Purchaser, and such consents and approvals shall~~<u>Specified Agreements. The agreements between Purchaser and each of NOV, Fountain, Nations and Grand including as assignee of Integral Equipment Leasing, LLC described in Recitals G, H, I</u>

- 23 -

and J, respectively, shall have been executed and remain in full force and effect as of the Closing.

(e)     Certain Contracts.  At the Closing, Sellers shall have assumed and assigned to Purchaser the Contracts set forth on Schedule 6.1(e), in each case free and clear or all Liens pursuant to Section 365 of the Bankruptcy Code and the Bankruptcy Sale Order.

(f)     Real Property Diligence.  With respect to any Acquired Owned Property, Sellers have provided Purchaser and its advisors with access to such facilities and Purchaser shall have received, in its discretion, satisfactory reports from its advisors with respect to such properties, including the completion of Phase I and similar reports as required.

(ge)     Deliverables.     Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.5(c).

Section 6.2     Conditions to Obligations of Sellers.  Sellers' obligations to sell the Acquired Assets a to take the other actions required to be taken by Sellers at the Closing are subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived in writing by Sellers, in whole or in part):

(a)     Representations, Warranties, and Covenants of Purchaser.  (i) Each of the representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date (as if made anew at and as of the Closing); and (ii) Purchaser shall have performed and complied in all material respects with all terms, agreements, and covenants contained in this agreement required to be performed or complied with by Purchaser on or before the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect.

(b)     Bankruptcy Court Approval.  The Bankruptcy Sale Orders (i) shall have been entered in both the ITS Case and the Diverse Cases in form and substance reasonably acceptable to Sellers, (ii) shall not be subject to a stay as of the date of Closing, and (iii) shall provide such other relief as may be reasonably necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement.

(c)     No Prohibition or Injunction.  No provision of any applicable law and no order or proceeding shall be in effect that shall prohibit or restrict the consummation of the Closing, or that is reasonably likely to cause a material adverse change to any of the Acquired Assets or to cause Purchaser or any of its affiliates to suffer any material adverse consequence under any applicable legal requirement or order.

- 24 -

(d)    Release of Claims.  Purchaser shall deliver to Sellers evidence of the release of any claims against Sellers and Sellers' respective bankruptcy estates from each of NOV, [Fountain, Nations and Grand], or Purchaser as assignee of any such parties, in each case, with respect to their respective agreements described in Recitals G, [H, I and J].[6]

(e)    Purchaser shall pay to Sellers at Closing an amount equal to the amount estimated by Sellers to be collected by Purchaser subsequent to the Closing for sales taxes owing to various taxing authorities relating to pre-Closing invoices issued by a Seller to a customer.  The funds received by Seller pursuant to the terms of this paragraph shall be held in trust by Sellers for the payment of sales taxes owing to various taxing authorities.  In the event the estimated payment made to Sellers pursuant to this paragraph exceed the actual tax amounts owing, such excess shall be promptly returned to Purchaser.

(df)    Deliverables.  Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.5(d).

## ARTICLE VII. - OTHER AGREEMENTS

**Section 7.1    Employees**.  Purchaser (or an affiliate of Purchaser), at its sole discretion, may desire to hire or employ certain employees of Sellers, on or after the Closing Date. Any such employee that accepts such employment, a "Transferred Employee."  Sellers shall terminate all employees who are offered employment by Purchaser (or an affiliate of Purchaser) effective as of the Closing Date or at such other time as may be agreed between the Parties.  Sellers agree that Purchaser retains sole and complete discretion with respect to which employees of Sellers to which Purchaser (or an affiliate of Purchaser) will offer employment.  Sellers shall be solely responsible for any obligations and liabilities related in any way to any termination of any of Sellers' employees from employment with Sellers occurring prior to or after the date of this Agreement, whether or not in connection with the transaction contemplated hereby. Sellers shall be solely responsible for all liabilities for employee or independent contractor compensation and benefits accrued or otherwise arising out of services rendered by its employees, directors and independent contractors prior to the Closing Date or arising by reason of actual, constructive, or deemed termination of their service relationship with Sellers at Closing, including all costs relating to the continuation of health benefits with respect to employees not hired by Purchaser after the Closing Date.

**Section 7.2    Casualty and Insurance**.  In the event all or any one of the Acquired Assets is damaged or destroyed prior to the Closing Date, Purchaser shall have the option to either: (a) exclude the damaged Acquired Asset from this Agreement and reduce the Purchase Price by an amount equal to the value of the Acquired Asset,

---

[6]    **Note to Draft**:  Releases against the estate have not yet been obtained by such parties and remain under consideration.

in which event the applicable Seller will retain any applicable insurance proceeds; or (b) apply the insurance proceeds for the damaged Acquired Assets to be assigned from Sellers to Purchaser, and proceed with the transaction. Sellers agree to maintain insurance on all of the Acquired Assets up to the Closing Date and to reasonably assist Purchaser to obtain insurance coverage on the Acquired Assets after the Closing Date. The risk of loss on the Acquired Assets remains on Sellers until the Closing.

**Section 7.3    Reservation of Rights Amongst Sellers Regarding Certain Asset Ownership**.  Notwithstanding anything seemingly to the contrary contained in this Agreement, ITS and the Diverse Debtors, and their respective bankruptcy estates, reserve any and all rights, claims and arguments by and amongst them regarding the allocation of Purchase Price.

**Section 7.4    Release**.   In consideration for the Purchase Price, as of and following the Closing Date, each Seller, on its own behalf and on behalf of its affiliates, knowingly, voluntarily and unconditionally releases and forever discharges any Transferred Employee from or for any and all claims, causes of action, demands, suits, liabilities, damages, losses, costs and expenses (including attorneys' fees) of every kind or nature whatsoever, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, that such Seller has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date to the extent related to the operations of the Business of Sellers or the Acquired Assets expressly excluding claims or causes of action for fraud, theft or other intentional misconduct (a "Potential Claim").   Each Seller hereby (a) expressly waives all provisions of, and rights and benefits conferred by any law that provides that a general release does not extend to claims that are unknown or unsuspected to the releasor at the time the releasor executes the release and (b) irrevocably covenants to refrain from asserting any Potential Claim, or commencing, instituting or causing to be commenced, any Legal Proceeding against Purchaser or such released individuals, or any of their respective affiliates, in any forum whatsoever (including any administrative agency).

## ARTICLE VIII. - BANKRUPTCY

**Section 8.1    Bankruptcy Court Approval**.    Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval in the Bankruptcy Sale Orders.

**Section 8.2    Commercially Reasonable Efforts**.  Sellers and Purchaser agree to use commercially reasonable efforts to do such acts and things and to execute and deliver such agreements and instruments and to take all such actions as may reasonably be required to consummate, evidence, confirm or obtain the Bankruptcy Court approval of the sale of the Acquired Assets in accordance with the terms of this Agreement, subject to higher and/or better Competing Transactions.

- 26 -

~~**Section 8.3**     **Break-up Fee and Expense Reimbursement**.   If for any reason Sellers consummate a Competing Transaction, then Sellers shall pay to Purchaser in cash on the Closing Date from the resulting sale proceeds a sum equal to 3% of the Purchase Price ("Break-up Fee"), but not to exceed the sum of $300,000.  The Break-up Fee shall be payable solely from the proceeds arising from a consummated Competing Transaction; provided, however, the Break-up Fee shall only be paid to Purchaser upon the occurrence or satisfaction of all of the following: (a) Purchaser has not materially defaulted in the performance of its obligations pursuant to this Agreement; and (b) Purchaser keeping its bid for the Acquired Assets open in accordance with the terms of this Agreement until the Closing of the sale of the Acquired Assets to a party other than Purchaser.  Sellers acknowledge and agree that (i) the approval of the Break-up Fee is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of Sellers' obligation to pay the Break-up Fee, Purchaser would not have entered into this Agreement, (iii) the entry of Purchaser into this Agreement is beneficial to Sellers and their bankruptcy estates because, in Sellers' business judgment, it will enhance Sellers' ability to maximize the value of the Acquired Assets, (iv) the Break-up Fee is reasonable in relation to Purchaser's efforts and to the magnitude of the transactions contemplated by this Agreement, and (v) the Break-up Fee  is intended to cover reimbursement of expenses actually incurred by Purchaser in connection with the transactions contemplated by this Agreement.   Sellers' obligations and Purchaser's rights under this Section 8.3 shall survive the termination of this Agreement.~~

**Section ~~8.4~~8.3** **Bankruptcy Sale Orders**.  The Bankruptcy Sale Orders shall be in form and substance reasonably acceptable to both Sellers and Purchaser approving and authorizing Sellers to consummate this Agreement and the transactions contemplated by this Agreement, including the sale of the Acquired Assets to Purchaser free and clear of all Liens other than Permitted Encumbrances.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bankruptcy Sale Orders, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Sellers shall use their reasonable best efforts to obtain a ruling that the Bankruptcy Sale Order is immediately effective notwithstanding the provisions of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

## ARTICLE IX. - TERMINATION

**Section 9.1**     **Termination Events**.  This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)     Mutual Termination.   Purchaser and Sellers may terminate this Agreement (i) by mutual written consent or (ii) by notice to the other Parties if the Closing has not occurred by 6:00 p.m. central time on ~~February 1~~January 29, 2016.

(b)     Automatic Termination.     This Agreement shall terminate automatically without any action or notice by Sellers to Purchaser or Purchaser to

- 27 -

Sellers immediately upon: (i) the issuance of a final and non-appealable Order by a Governmental Body to restrain, enjoin, or otherwise prohibit the transfer of the Acquired Assets, to Purchaser as contemplated by this Agreement; or (ii) the closing of a Competing Transaction.

(c)     Termination by Purchaser.     Purchaser may terminate this Agreement: (i) if the Bankruptcy Court has not entered the Bankruptcy Sale Orders in both the ITS Case and Diverse Cases by January ~~19~~22, 2016 (with respect to this Agreement); (ii) if there has been a material violation or breach by any Seller of any material representation, warranty, or covenant contained in this Agreement; (iii) if prior to the Closing Date, either the ITS Case or the Diverse Cases are converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case; (iv) if an event or circumstance has a material adverse effect on the value of the Acquired Assets; (v) if any condition precedent to the Closing has not been met by the Closing Date; (vi) if any secured creditor obtains relief from the automatic stay provided by Section 362 of the Bankruptcy Code to foreclose on any material Acquired Asset, or if any secured creditor takes any material, adverse action with respect to any material Acquired Asset; or (vii) some or all of the Sellers execute an agreement with respect to a Competing Transaction.

(d)     Termination by Sellers.  Sellers may terminate this Agreement if (i) the Bankruptcy Court dismisses or converts the Bankruptcy Cases pursuant to sections 1112(b) or 305(a) of the Bankruptcy Code, or (ii) there has been a material breach or violation by Purchaser of a material representation, warranty, or covenant contained in this Agreement.

**Section 9.2     Effect of Termination**. In the event Sellers default under this Agreement, Purchaser may elect to enforce specific performance of this Agreement as opposed to terminating this Agreement.  If this Agreement is terminated for any reason other than pursuant to Section 9.1(d)(ii), the Trust Deposit shall be returned to Purchaser, and this Agreement shall terminate and be of no further force and effect. Purchaser shall have no other or further claim against Sellers, including for any damages for loss of its bargain or expenses incurred by Purchaser in connection with this Agreement. If this Agreement is terminated pursuant to Section 9.1(d)(ii), Sellers shall retain the Trust Deposit as its sole and exclusive remedy as against Purchaser.

## ARTICLE X. - MISCELLANEOUS

**Section 10.1  Governing Law, Jurisdiction**.

(a)     This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Texas (without giving effect to the principles of conflict of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law. For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising

- 28 -

under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.   After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in Harris County, Texas.

(b)    Each of the Parties hereby consents to process being served by any party to this Agreement in any Legal Proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.3.

**Section 10.2   JURY TRIAL WAIVER**. EACH PARTY HEREBY WAIVES AND RELINQUISHES ANY RIGHT TO TRIAL IN ANY LAWSUIT OR JUDICIAL PROCEEDING IN ANY WAY RELATING TO, PERTAINING TO, OR ARISING OUT OF THIS AGREEMENT OR ANY DOCUMENT EXECUTED PURSUANT HERETO.

**Section 10.3   Notices**.    All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) upon receipt of confirmation of receipt if sent by facsimile transmission, (c) on the day such communication was sent by e-mail or (d) one Business Day following the day sent by overnight courier, in each case at the following addresses, facsimile numbers and e-mail (or to such other address, facsimile number or e-mail as a party may have specified by notice given to the other party pursuant to this provision):

If to Sellers, including ITS Water and AFG to:

Diverse Energy Systems, LLC; Diverse Energy Systems, LLC, d/b/a
Lean Technologies, LLC; Rouly, Inc.; and Scribner Industries, Inc.
c/o John Boylan, Chief Restructuring Officer
EJC Ventures, LP
801 Travis, Suite 1425
Houston, TX 77002
~~801 Travis, Suite 1425~~
~~Houston, TX 77002~~
E-mail: jboylan@ejc-ventures.com

ITS Engineered Systems, Inc.
c/o Cary Grossman, Chief Restructuring Officer
Shoreline Capital Advisors**,** Inc.
Three Riverway, Suite 1010
Houston, TX 77056
E-mail: cgrossman@shorelinecapitaladvisors.com

with a copy (which will not constitute notice) to:

Bobby Forshey

- 29 -

Forshey & Prostok, L.L.P.
777 Main Street, Suite 1290
Fort Worth, TX 76102
E-mail: bforshey@forsheyprostok.com

     Micheal W. Bishop
     Gray Reed & McGraw, P.C.
     1601 Elm Street, Suite 4600
     Dallas, TX 75201
     E-mail: mbishop@grayreed.com

If to Purchaser, to:

     Cimarron ~~Energy Inc~~<u>Acquisition Co</u>.
     c/o Turnbridge Capital Management, LLC
     100 Crescent Court, Suite 800
     Dallas, TX 75201
     Attention:   Todd M. Tomlin
     E-mail:     ttomlin@turnbridgecapital.com

with a copy (which will not constitute notice) to:

     Jones Day
     2727 North Harwood Street
     Dallas, Texas  75201
     Facsimile: (214) 969-5100
     Attention:  R. Scott Cohen
               Michael Considine
     Email:     scohen@jonesday.com
             mpconsidine@jonesday.com

     **Section 10.4**  <u>**Assignment**</u>.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any Seller or the Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; <u>provided</u>, <u>however</u>, that Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more wholly-owned subsidiaries formed by it prior to the Closing.

     **Section 10.5**  <u>**Severability**</u>. In the event any provision of this Agreement is found to be void and unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall nevertheless be binding upon the Parties with the same effect as though the void or unenforceable part had been severed and deleted.

- 30 -

**Section 10.6   Counterparts**. This Agreement may be executed in one or more counterparts, including facsimile or electronic counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**Section 10.7   Entire Agreement; Amendments and Waivers**. This Agreement, including the Schedules and Exhibits hereto, contains the entire understanding and agreement between the Parties with respect to the subject matter hereof. This Agreement supersedes all prior agreements and understandings between the Parties with respect to such subject matter.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained in this Agreement.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

## ARTICLE XI.- DEFINED TERMS

**Section 11.1   Certain Definitions**.   For purposes of this Agreement, the following terms, when used in this Agreement with initial capital letters, have the meanings specified in this Section 11.1 or in other Sections of this Agreement identified in Section 11.2:

"Account" shall have the same meaning as in section 9.102(a)(2) of the UCC, but shall exclude any Accounts owing by the Diverse Debtors to ITS or among any of the Sellers.

"Acquired Intellectual Property" means the Intellectual Property owned by any Seller.

"Acquired Owned Property" means collectively, the Diverse Real Estate, and the Rouly Real Estate and the Katy Texas Property and Equipment.

"Acquired Real Property" means collectively, Acquired Owned Property and the Real Estate Leases.

"AFG" means Acquisitions Finance Group, Inc., a Delaware corporation.

"Auction" has the meaning set forth in the Bidding Procedures.

- 31 -

"Avoidance Actions" means all avoidance actions or similar causes of action and associated remedies arising under sections 544 through 553 of the Bankruptcy Code.

"Bankruptcy Sale Order" or "Bankruptcy Sale Orders" means orders of the Bankruptcy Court, respectively entered in the Diverse Cases and the ITS Case, authorizing the sale of Acquired Assets pursuant to this Agreement.

"Bidding Procedures" means the bidding procedures attached to Exhibit A.

"Business Day" means any day of the year on which banking institutions in New York City are open to the public for conducting business and are not required or authorized to close.

"Chattel Paper" shall have the same meaning as in section 9.102(a)(11) of the UCC.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Transaction" means any of the following, other than the transactions contemplated by this Agreement: (a) the sale or disposition by Sellers of all or the majority of the outstanding equity interests of any Seller or the sale or disposition of all or the majority of the Acquired Assets, in either case which substantially prohibits or impairs the transactions contemplated by this Agreement, including a transaction that is the result of a successful bid by any Person other than Purchaser at the Auction; or (b) a merger, consolidation, business combination, liquidation, recapitalization or similar transaction of all or substantially all of the Acquired Assets.  However, "Competing Transaction" shall not include the disposition of any Acquired Assets or otherwise upon the conversion of any of Sellers' bankruptcy cases to proceedings under Chapter 7 of the Bankruptcy Code, or the foreclosure or other execution of state law remedies by a secured creditor or lessor against their respective collateral or property.

"Contract" means any contract, indenture, note, bond, lease or other agreement, whether written or oral.

"Customer Deposits" means any deposits paid to any Seller on account of any goods to be or being fabricated by such Seller.

"Environment" means soil, surface waters, groundwater, land, stream sediments, surface or subsurface strata, ambient air, indoor air or indoor air quality, including, without limitation, any material or substance used in the physical structure of any building or improvement.

"Environmental Condition" means any condition of the Environment with respect any property currently or previously owned, leased or operated by any Seller or with respect to any other real property at which any Hazardous Substance generated by

- 32 -

the operation of the Business prior to the Closing Date has been treated, stored or disposed of, which violates any Environmental Law, or results in any Release, or threat of Release, damage, loss, cost, expense, claim, demand, order or liability.

"Environmental Law" means any law, policy or guideline relating to protection of the Environment, Releases of Hazardous Substances, public or workplace health and safety or injury to Persons relating to exposure to any Hazardous Substance.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) (a) under common control within the meaning of Section 4001(b)(1) of ERISA with any of Sellers or (b) which together with any of Sellers is treated as a single employer under Section 414(t) of the Code.

"Final Order" means an Order (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing, motion for reconsideration or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon, and (b) as to which the time for instituting or filing an appeal, motion for rehearing, motion for reconsideration or motion for new trial shall have expired; provided, however, that even if an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing, motion for reconsideration or motion for new trial are timely filed, an Order will be deemed a Final Order if it provides that it is effective immediately upon entry on the Court's docket and not subject to any stay notwithstanding the provisions of Federal Rule of Bankruptcy Procedure 6004(h), 6006(d), 7062 and Federal Rule of Civil Procedures 62, and that no stay pending appeal has been obtained.

"GAAP" means generally accepted accounting principles in the United States, consistently applied throughout the specified period and the immediately prior comparable period.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hazardous Substance" means any "toxic substance," "hazardous pollutant," "hazardous waste," "hazardous material" or "hazardous substance" under any Environmental Laws.

- 33 -

"Instruments" shall have the same meaning as in section 9.102(a)(47) of the UCC.

"Intellectual Property" means all worldwide intellectual property and rights, title and interests arising from or in respect of the following:  all (a) inventions, discoveries, industrial designs, utility models, business methods, patents and patent applications (including provisional and Patent Cooperation Treaty applications), including continuations, divisionals, continuations-in-part, reexaminations and reissues, extensions, renewals and any patents that may be issued with respect to the foregoing (collectively, "Patents"); (b) trademarks, service marks, certification marks, collective marks, trade names, business names, slogans, acronyms, forms of advertisement, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, designs, devices, signs, symbols, design rights including product design, configuration and packaging rights, internet domain names, user names, screen names, internet and mobile account names, icons, symbols or designations, corporate names, and general intangibles of a like nature and other indicia of identity, origin or quality, whether registered, unregistered or arising by law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing (collectively, "Trademarks"); (c) published and unpublished works of authorship in any medium, whether copyrightable or not, whether in final form or not, in all media now known or hereafter created, including writings, graphics, artworks, photographs, compositions, sound recordings, motion pictures and audiovisual works, databases and other compilations of information, computer software, mobile and internet applications and content, source code, object code, algorithms, and other similar materials, all packaging, advertising and promotional materials related to the products, and all copyrights and moral rights, to the fullest extent assignable or waivable, therein and thereto, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"); and (d) confidential and proprietary information, trade secrets, and know-how, including methods, processes, business plans, strategy, marketing data, marketing studies, advertisements, schematics, concepts, software and databases (including source code, object code and algorithms), formulae, recipes, drawings, prototypes, models, designs, devices, technology, research and development and customer information and lists (collectively, "Trade Secrets"), together with all rights of action for past, present and future infringement of any of the foregoing Intellectual Property and the right to receive all proceeds and damages therefrom.

"Inventory" shall mean inventory (including raw materials), as defined in section 9.102(a)(48) of the UCC as of a specified date less any Customer Deposits attributable to any of such Inventory as of such date.

"IRS" means the Internal Revenue Service.

"ITS Water" means ITS Water Solutions, Inc., a Delaware corporation.

"Knowledge of Sellers" means the actual knowledge of those officers of each of Sellers respecting their entities and their respective bankruptcy estates, on a several and not a joint basis, identified on Schedule 11.1(a).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Notes" shall have the same meaning as in section 3.104 of the UCC, and shall also include all negotiable instruments.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment.

"Taxes" means: (a) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, Inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes; (b) any item described in clause (a) for which a taxpayer is liable as a transferee or successor, by reason of being a member of an affiliated, consolidated, combined or unitary group or the regulations under Section 1502 of the Code, or by Contract, indemnity or otherwise; and (c) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (a) or (b).

"Tax Authority" means any Governmental Body or employee thereof charged with the administration of any law relating to Taxes.

"Transfer Tax" means any sales, use, bulk transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, or based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

- 35 -

"UCC"  shall mean the Texas Business & Commerce Code.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar law, and the rules and regulations thereunder.

"WIP" shall mean work-in-progress as of a specified date, less any Customer Deposits attributable to any specific item of WIP as of such date.

**Section 11.2   Terms Defined Elsewhere in this Agreement**.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|---|---|
| 2014 Financial Statements | 3.3(a) |
| Acquired Assets | 1.1 |
| Agreement | Preamble |
| Amended and Restated Agreement | Recitals |
| Assumed Liabilities | 1.7 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Books and Records | 1.5(~~f~~d) |
| ~~Break-Up Fee~~ | ~~8.3~~ |
| Business | Recitals |
| Closing | 2.5 |
| Closing Date | 2.5(a) |
| Convey | 1.1 |
| Copyrights | 11.1 |
| Cure Costs | 2.3 |
| Deposits | 1.5(~~e~~a) |
| Diverse | Preamble |
| Diverse Accounts | 1.2(j) |
| Diverse Acquired Assets | 1.2 |
| Diverse Cases | Recitals |
| Diverse Debtors | Recitals |
| Diverse Equipment | 1.2(a) |
| Diverse Furniture | 1.2(e) |
| Diverse Intellectual Property | 1.2(i) |
| Diverse Inventory | 1.2(b) |
| Diverse Real Estate | 1.2(d) |
| Diverse Real Estate Leases | 1.2(g) |
| Diverse Sales Procedures Order | Recitals |
| Diverse Texas | ~~Preambles~~Preamble |
| Equipment Leases | 1.2(h) |
| ~~Equipment Lessors~~ | ~~1.5(a)~~ |
| Excluded Assets | 1.6 |
| Excluded Liabilities | 1.8 |
| ~~Expense Reimbursement~~ | ~~8.3~~ |
| Financial Statements | 3.3(a) |
| Fountain | Recitals |

- 36 -

| Term | Section |
|------|---------|
| Grand | Recitals |
| Interim Financial Statements | 3.3(a) |
| ITS | Preamble |
| ITS Accounts | 1.3(g) |
| ITS Acquired Assets | 1.3 |
| ITS Case | Recitals |
| ITS Equipment | 1.3(a) |
| ITS Furniture | 1.3(d) |
| ITS Intellectual Property | 1.3(e) |
| ITS Inventory | 1.3(b) |
| ITS Option Rights | 1.3(f) |
| ITS Sales Procedures Order | Recitals |
| ITS WIP | 1.3(c) |
| Katy Texas Property and Equipment | 1.5(b) |
| Leased Equipment | 1.5(a) |
| Leased Real Property | 3.14(b) |
| Lien | 1.2 |
| Major Customers | 3.11 |
| Major Suppliers | 3.12 |
| Nations | Recitals |
| NOV | Recitals |
| Party | Preamble |
| Parties | Preamble |
| Patents | 11.1 |
| Permitted Encumbrances | 1.10 |
| Potential Claim | 7.4 |
| Purchase Price | 2.1 |
| Purchased Contracts | 1.2(f) |
| Purchaser | Preamble |
| Real Property Lease | 3.14(b) |
| Rental Equipment | 1.2(c) |
| Rouly | Preamble |
| Rouly Acquired Assets | 1.4 |
| Rouly Equipment | 1.4(a) |
| Rouly Furniture | 1.4(c) |
| Rouly Intellectual Property | 1.4(e) |
| Rouly Inventory | 1.4(b) |
| Rouly Real Estate | 1.4(d) |
| Rouly Real Estate Leases | 1.4(f) |
| Scribner | Preamble |
| Seller | Preamble |
| Sellers | Preamble |
| Trade Secrets | 11.1 |
| Trademarks | 11.1 |
| Transfer Tax | 1.7 |
| Transferred Employee | 7.1 |
| Trust Deposit | 2.4 |

- 37 -

**Section 11.3   <u>Other Definitional and Interpretive Matters</u>**.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)     <u>Calculations</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     <u>Captions</u>. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(iii)     <u>Gender and Person</u>. Wherever the context so requires, the masculine pronoun shall include the feminine and the neuter, the neuter pronoun shall include the feminine and the masculine, and the singular shall include the plural and the plural shall include the singular.

(iv)     <u>Dollars</u>.  Any reference in this Agreement to $ will mean U.S. dollars.

(v)     <u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to in this Agreement are hereby incorporated in and made a part of this Agreement as if set forth in full in this Agreement.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

(vi)     <u>Including</u>.  The word "including" or any variation thereof means "including, without limitation," and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(vii)     <u>Herein</u>.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not

- 38 -

merely to a subdivision in which such words appear unless the context otherwise requires.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

*[remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written.

**SELLERS:**

DIVERSE ENERGY SYSTEMS, LLC,
a Texas Limited Liability Company

By:_____
     John Boylan, Chief Restructuring Officer

DIVERSE ENERGY SYSTEMS, LLC,
~~a Texas Limited Liability Company~~
~~By:~~_____
~~   Chet Erwin, President~~
~~DIVERSE ENERGY SYSTEMS, LLC,~~ D/B/A
LEAN TECHNOLOGIES, LLC, a North Dakota
Limited Liability Company

By:_____
     John Boylan, Chief Restructuring Officer

~~DIVERSE ENERGY SYSTEMS, LLC, D/B/A~~
~~LEAN TECHNOLOGIES, LLC, a North Dakota~~
~~Limited Liability Company~~
~~By:~~_____
~~   Chet Erwin, President~~
ITS ENGINEERED SYSTEMS, INC.

By:_____
     Cary Grossman, Chief Restructuring Officer

ITS ENGINEERED SYSTEMS, INC.

By:_____
     Todd Hass, Chief Financial Officer,

ITS ENGINEERED SYSTEMS, INC.

[Asset Purchase Agreement]

By:_____
    Roger Wagner, President


ROULY, INC.


By:_____
    John Boylan, Chief Restructuring Officer


SCRIBNER INDUSTRIES, INC.


By:_____
    John Boylan, Chief Restructuring Officer


[Asset Purchase Agreement]

**PURCHASER:**
CIMARRON ACQUISITION CO.


By:_____
     Todd M. Tomlin, Secretary

[Asset Purchase Agreement]

| Summary report: | |
|---|---|
| **Litéra® Change-Pro TDC 7.5.0.96 Document comparison done on 1/15/2016 10:12:00 AM** | |
| **Style name:** JD Color With Moves | |
| **Intelligent Table Comparison:** Inactive | |
| **Original DMS:**iw://NAI/NAI/1500669713/8 | |
| **Modified DMS:** iw://NAI/NAI/1500669713/12 | |
| **Changes:** | |
| Add | 157 |
| Delete | 141 |
| Move From | 3 |
| Move To | 3 |
| Table Insert | 5 |
| Table Delete | 6 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 315 |