IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | ) ) ) | **Chapter 11 Cases** |
| **DIVERSE ENERGY SYSTEMS, LLC** | ) ) | **Case No. 15-34736** |
| **SCRIBNER INDUSTRIES, INC.** | ) | **Case No. 15-34737** |
| **DIVERSE ENERGY SYSTEMS, LLC** | ) | **Case No. 15-34738** |
| **d/b/a LEAN TECHNOLOGIES, LLC** | ) | |
| **ROULY, INC.** | ) ) | **Case No. 15-34739** |
| **Debtors.** | ) ) | **Jointly Administered Under** |
| | ) ) ) | **Case No. 15-34736-11** |

**LENDTEQ, LLC'S OBJECTION TO PROPOSED SALE**
[R<small>ELATES TO</small> D<small>KT</small>. N<small>OS</small>. 178, 212, 265, 303, 318, 326, 331, 333, 337, 341, 342 <small>AND</small> 345]

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW Lendteq, LLC, in its own capacity and as successor-in-interest to BFX Energy Equipment LLC ("Lendteq"), and files this objection ("Objection") to the *Motion to Establish Bid Procedures and to Sell Certain Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests Pursuant to 11 U.S. C. § 363 and to Assume and Assign Executory Contracts and Leases* [Dkt. No. 178] (as such motion has been supplemented, the "Sale Motion" and the sale proposed therein being the "Sale") filed by the above-captioned debtors (the "Debtors") and respectfully shows the Court as follows:

**I.
SUMMARY OF OBJECTION**

1. Lendteq objects to the Sale for three reasons. First, the Sale, as currently structured, completely guts the Debtors' estate without providing for an appropriate wind-down

budget. As further described *infra*, the Debtors' interactions with Lendteq suggest that certain of the Debtors' business dealings were inconsistent with applicable law. To the extent that these interactions indicate a pattern by the Debtors, the Debtors' bankruptcy estates may have claims against certain directors, officers and, possibly, shareholders. Because such a pattern could exist and the proposed Sale lacks any form of budget to properly investigate estate causes of action, the Sale constitutes an impermissible *sub rosa* plan as it sidesteps the Code's "best interests" test. This is especially concerning given that no statutory committee has been appointed in these bankruptcy cases. To this end, Lendteq respectfully submits that an independent trustee—either in the form of a Chapter 7 trustee or a liquidating trustee (pursuant to a liquidating plan)—should be empowered to evaluate estate causes of action.

2. Lendteq also objects to the manner in which its interests are treated in the Sale. The Sale proposes to assume and assign the Lendteq/DES Agreement[1] to Cimarron without payment of any cure costs. The Lendteq/DES Agreement is not subject to assumption under Code § 365 because Lendteq has fully performed its obligations thereunder and thus the agreement is not executory. Moreover, the outstanding defaults, to the extent they were curable, have resulted in damages to Lendteq that exceed $500,000.

3. Finally, Lendteq objects to the ambiguity contained within the Sale regarding which assets are being sold. More particularly, Lendteq objects to the Sale to the extent it authorizes the Debtors to sell equipment belonging to Lendteq.

---

[1] Capitalized terms used in this summary are defined elsewhere in this Objection.

## II.
## RELEVANT HISTORY

4. On September 7, 2015, the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code" or "Code").

5. Notably, no creditor's committee has been appointed in these cases.

6. The Debtors initially filed their Sale Motion on November 5, 2015.[2]

7. On January 12, 2016, the Bankruptcy Court held a status conference on the Sale Motion and a hearing on the Court's Order to Show Cause [Dkt. No. 303]. Prior to this status conference, Lendteq filed a limited objection to the Sale Motion [Dkt. No. 318] (the "Limited Objection") requesting that certain equipment be specifically excluded from the Sale.

8. The Motion has been supplemented numerous times including, most recently, on January 15, 2016 (this past Friday), when the Debtor's filed a third supplement to the Sale motion that included (i) a copy of the proposed Asset Purchase Agreement [Dkt. No. 333] (the "APA"), between *inter alia* the Debtors and Cimarron Acquisition Co. ("Cimarron") and (ii) the proposed schedules to the APA [Dkt. No. 345] ("Schedules" and each a "Schedule"). The Debtors also filed a proposed sale order [Dkt. No. 342] (the "Proposed Order") on January 15, 2016.

9. While the Debtors initially reported to the Bankruptcy Court that they were seeking a potential auction of the Debtors' assets, the Debtors filed a notice on Sunday, January

---

[2] Dkt. No. 178.

17, 2016, suggesting that no auction will be conducted but the Debtors are intending to proceed with the hearing on the Sale Motion.[3]

10. A hearing on the Sale Motion had been scheduled to begin at 12:00 p.m. (Central) on Tuesday, January 19th, 2016 in the Courtroom of the Honorable David R. Jones, Chief Bankruptcy Judge. But the Debtors notified parties in interest on the eve of such hearing,[4] and, that the APA has not been finalized and thus the Debtors intend to treat the January 19th hearing as a status conference.

### III.
### OBJECTION

A. **The Proposed Sale Constitutes a *Sub Rosa* Plan Because It Buries The Debtors Without Providing For Appropriate Burial Costs.**

11. In its present form, the proposed Sale lacks any form of a wind-down budget and lacks any mechanism to prosecute estate causes of action. Indeed, the only allocation for any wind-down of the Debtors is that "for a period of 90 days after the Closing, [Debtors as] Sellers shall be entitled to reasonable assistance from Diverse's accounting staff that are Transferred Employees to assist in the wind-up of Sellers' accounting and business."[5] But such funds must be repaid by the Debtors' estates.[6] The absence of an appropriate wind-down budget is

---

[3] Dkt. No. 345.

[4] Debtors' eleventh-hour notice was sent on Martin Luther King Day, a Legal Holiday. *See* Federal Rule of Bankruptcy Procedure 9006(a)(6).

[5] APA at 12 § 2.6; *see also* APA at 22 § 7.1 (defining Transferred Employee to be those of the Debtors' employees hired by Cimarron).

[6] *See* APA at 12 § 2.6 ("Sellers shall reimburse Purchaser for the services of such accounting personnel based on a reasonable hourly rate directly tied to the compensation paid to such members of the accounting staff by Purchaser.").

especially concerning given the lack of oversight by an Official Committee of Unsecured Creditors.[7]

12. The Fifth Circuit has long rejected the use of Code § 363 to short-circuit safe guards that exist in confirmation.[8] Section 363 Sales do not permit the debtors to "gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan."[9] Indeed, Judge Steen—after providing a comprehensive review of *Braniff* and its progeny—concluded that bankruptcy courts should weigh the circumstances of a proposed sale and fashion adequate safeguards to protect rights that would be available under confirmation.[10] In rejecting a sale similar to that contemplated by the Debtors' Sale Motion, Judge Steen held that:

> The § 363(b) movant should be prepared to prove, not just allege, why it is appropriate to provide extraordinary bankruptcy authority and remedies solely for the benefit of .. part[ies] whose contract[s] under state law do[] not provide those remedies and benefits. And if the proposed transaction will ***not even pay all of the expenses of the bankruptcy proceeding***, it would be especially difficult to understand ***why the purchaser should get the benefit of extraordinary bankruptcy powers*** and remedies for which it did not pay.[11]

---

[7] *See* Dkt. No. 136 (notice of the United States Trustee's inability to form a statutory committee). The United States Trustee did not solicit Lendteq's interest in serving on such any such committee because, upon information and belief, the United States Trustee's office was not made aware of Lendteq's claim until recently. *See* Dkt. No. 136. Indeed, Lendteq is not included in the Debtors' list of its largest unsecured creditors despite its claim of no less than $501,216.30. *See* Case No. 15-34736, Dkt. No. 2 (list of largest unsecured creditors); Case No. 15-34738, Dkt. No. 2 (list of largest unsecured creditors) *to* Case No. 15-34736, Proof of Claim No. 42 (Lendteq's proof of claim); Case No. 15-34738, Proof of Claim No. 79 (Lendteq's proof of claim).

[8] *In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir. 1983); *In re Babcok and Wilcox Co.,* 2550 F.3d 955, 960 (5th Cir. 2001).

[9] *In re Babcock & Wilcox Co.*, 250 F.3d at 960.

[10] *In re Gulf Coast Oil Corp.,* 404 B.R. 407, 423 (Bankr. S.D. Tex. 2009) (Steen, J.).

[11] *Id.* at 427.

13.     Here, the lack of any wind-down budget allows the Debtors to sidestep Code § 1129(a)(7)'s "best interests" test.[12]  Specifically, the Debtors cannot show that unsecured creditors will receive property that is not less than the amount they would receive if the Debtors were liquidated under Chapter 7.[13]  While the Sale specifically provides for allocation to the senior lenders, the Debtors have consistently commented to the Court that this case is on the brink of administrative insolvency.[14]  However, the Debtors have not given adequate weight to Debtors' potential causes of action.

14.     Lendteq's claims against the Debtors arise from certain material misrepresentations made by the Debtors in connection with Lendteq's purchase from the Debtors of certain equipment.[15]  Post-petition, Lendteq discovered that these representations were false.[16] More disturbing is the fact that certain of the Debtors' executives orchestrated the transactions with Lendteq.[17]

15.     To the extent that these business dealings are indicative of the manner in which the Debtors' businesses were conducted, the Debtors' estates and creditors may have claims

---

[12] *See In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1228 (5th Cir. 1986) (holding that denial based on *Braniff* doctrine is appropriate when objecting party specifies what protections are being denied by sale).

[13] Code § 1129(a)(7).

[14] *Compare* Proposed Order at 16 (setting forth distribution of sale proceeds) to Debtors' Response to Order to Show Cause, Dkt. No. 310 at 3-4 ¶ 12 ("The Debtors understand that, given the Debtors' cash flow situation, if an agreement on the terms of the proposed sale is not reached soon, there may be no alternative but to convert the Debtors' cases to chapter 7.").

[15] Specifically, Lendteq paid the Debtors $511,920.00 in consideration for four 18,000 gallon "bullet" tanks from the Debtors. Lendteq made such purchases in reliance on representations by the Debtors regarding their ownership and/or ability to acquire these tanks. *See* Case No. 15-34736, Proof of Claim No. 42 (Lendteq's proof of claim); Case No. 15-34738, Proof of Claim No. 79 (Lendteq's proof of claim) (collectively, Lendteq's "Proofs of Claim"). The descriptions contained in the Proofs of Claim are hereby incorporated herein by reference as such descriptions are applicable.

[16] *See* Email from R. Forshey (counsel to Debtors) to J. Bain and F. Hartley (counsel to Lendteq), attached hereto as Exhibit A.  Notably, the Debtors Chief Financial Officer, Todd Hass, was included in this correspondence.

[17] *See* Email Correspondence from Shar Holmen, Debtors' Vice President/Operations Controller, and Doug Erwin, Debtors' Business Development Director, to R. Wiley and M. Wilding of Lendteq, attached hereto as Exhibit B. Upon information and belief, Doug Erwin is brother to Chet Erwin, the Debtors' Chief Executive Officer.

against certain officers and directors for breach of fiduciary duty and may have claims against certain shareholder for alter ego / piercing the corporate veil.[18] The current Sale makes no provision for an appropriate wind-down budget to investigate such claims.

16. Rather, the Sale includes employment agreements for the Debtors' current and/or former Chief Executive Officer, Chief Financial Officer, and Chief Operating Offer.[19] Moreover, the Sale provides for the assignment of certain personal guaranties by Todd Hass and Roger Wagner.[20] And, upon information and belief, the Sale includes releases to each of the foregoing, as "Transferred Employees" under the APA.[21] And the Sale fails to treat the Debtors' potential claims against its officers, directors, and shareholders (to the extent such claims exist) as "Excluded Assets."[22]

17. Given the compressed timeline of the Sale, Lendteq has been unable to confirm whether the persons mentioned herein have necessarily violated their fiduciary obligations to the Debtors.[23] But Lendteq objects to the Sale, as it presently stands, because the Debtors cannot demonstrate that unsecured claims would be worse off in a Chapter 7 liquidation proceeding. *See also In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) (Friendly, J.) ("The conduct of bankruptcy proceedings not only should be right but must seem right."). In a Chapter 7

---

[18] *See In re Moore*, 608 F.3d 253, 258-59 (5th Cir. 2010) (holding that certain alter ego claims belong to the estate); *Matter of S.I. Acquisition*, 817 F.2d 1142, 1152 (5th Cir. 1987) (same).

[19] *See* APA at 11 § 2.5(c)(ix) and Schedule 2.5(c)(ix) (conditioning Sale on ability to secure Non-Competition, Consulting or Employment Agreements from Charles D. Erwin, Roger Wagner and Todd Hass).

[20] *See* APA at 11 § 2.5(c)(viii) (conditioning sale on delivery of such assignment).

[21] *See* APA at 23 § 7.4; *see also* APA at 22 § 7.1 (definition of "Transferred Employee").

[22] *See* APA at 6-7 § 1.6. As it currently stands, the APA is unclear on this issue.

[23] In stating the foregoing, Lendteq reserves the right to further investigation the Debtors' business dealings under Fed. R. Bankr. P. 2004.

liquidation, an independent Trustee would be appointed to examine such claims.[24] Indeed, an independent examination of such claims could produce additional recoveries to the Debtors' creditors.[25] As an alternative to conversion, this Court might consider ordering that certain of the Sale proceeds would be allocated to an appropriate wind-down budget, for use by an independent party (such as a liquidating trustee) to examine the viability of estate causes of action.[26]

**B.     The Proposed Sale Inappropriately Seeks to Nullify Lendteq's Claims Against the Debtors.[27]**

18.     In addition to the more global issues identified *supra*, Lendteq objects to the manner in which the Sale attempts to treat Lendteq's interests. The Sale effectively seeks to transfer and nullify the Debtors' obligation to Lendteq by misapplication of Code § 365.[28] Specifically, the Sale treats the agreements between Lendteq and the Debtors as an executory contract and seeks to assume and assign such agreement while paying no cure cost.[29] Even

---

[24] *See In re Cooper*, 405 B.R. 801, 810 (Bankr. N.D. Tex. 2009) (noting role of independent trustee in Chapter 7 cases as opposed to Chapter 11 cases; "Conflicts of interest are, of course, frequently encountered in Chapter 11, where the metaphor of the 'fox guarding the hen house' is often apropos.").

[25] *See id.*

[26] If the Sale were approved under these circumstances, Lendteq respectfully submits that the Sale Order should explicitly provide that any Sale is without prejudice to the ability of the Debtors' estates to prosecute such causes of action.

[27] Given the lack of notice provided by the Debtors and consistent with the terms of the Debtors Proposed Order, Lendteq reserves the right to further supplement these objections in anticipation of any Cure Hearing (as defined in the Proposed Order). *See* Proposed Order at 11-12, ¶¶ BB and 2.

[28] Code § 365 provides, in relevant part, that a debtor-in-possession, "subject to the court's approval, may assume … any executory contract or unexpired lease of the debtor" and assign the same to a third party. Code §§ 365(a) and (f). However, in order to do so, the Debtor must comply with the safeguards present in Code § 365, including the obligation to cure any defaults and provide adequate assurance of future performance. *See* Code §§ 365(b)(1) and (f)(2).

[29] *See* APA at 3-4 §§ 1.1 and 1.2(f); Schedule 1.2(f) at 2 (unnumbered; pdf page 58 of 173) (identifying the Debtors' POs with Lendteq as "Purchased Contracts" with $0.00 cure cost); *see also* Dkt. No. 337, Notice of Revised Exhibit "A" to Notice of (I) Possible Assumption and Assignment of Executory Contracts and Unexpired Leases, (II) Proposed Cure Amounts and (III) Deadline to Object Thereto at pdf page 7 of 24) (identifying the Debtors' POs with Lendteq as potential executory contracts with $0.00 cure cost).

worse, the proposed Sale order (as previously defined, "Proposed Order") seeks to further nullify the Debtors' liabilities to Lendteq:

> Each non-Debtor counterparty to a Purchase Contract is forever barred, estopped, and ***permanently enjoined from asserting*** against the Diverse Debtors or the Purchase or their respective property (including, without limitation, the Acquired Assets) in connection with this transaction … ***any claim, counterclaim, defense, breach, default, condition, setoff or other claim asserted or capable of being asserted against the Diverse Debtors existing as of the Closing Date or arising by reason of the Closing, except for the Permitted Encumbrances and Assumed Liabilities***.[30]

Also prejudicial, the Proposed Order includes a finding that no other defaults exists:

> ***No monetary or non-monetary defaults exist*** in the Diverse Debtors' performance under the Purchased Contracts as of the date of this Order other than the failure to pay amounts equal to the Cure Costs or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.[31]

19. As previously mentioned, Lendteq's claims against the Debtors result from Lendteq's payment to Debtors for the purchase of four 18,000 gallon "bullet" tanks. Lendteq purchased these tanks by paying Debtors the entire amount due of $511,920.00 and remitting $42,233.40 in sales taxes.[32] No further obligations remain for Lendteq to perform.[33] Thus, the Debtors' obligations to Lendteq cannot be characterized as an "executory contract" because there is no remaining obligation on the part of Lendteq.[34] Lendteq fully performed its obligations.

---

[30] Proposed Order at 20 ¶ 22 (emphasis added).

[31] Proposed Order at 11-12 ¶ DD (emphasis added).

[32] *Compare* Exhibit C (invoices issued by Debtors for a total amount of $554,153.40, that includes the $511,920.00 payment and sales taxes in the amount of $42,233.40) *to* Exhibit D (bank account statement showing that wire was made to Debtors and check issued for collective amount owed).

[33] A copy of the binding proposal between Lendteq and the Debtors (the "Lendteq/DES Agreement" or "Agreement") is attached hereto as Exhibit E.

[34] *See, e.g., In re MCorp Fin., Inc.*, 122 B.R. 49, 51 (Bankr. S.D. Tex. 1990) (citing *In re American Magnesium Company*, 488 F.2d 147 (5th Cir.1974); *In re Jackson Brewing Co.*, 567 F.2d 618 (5th Cir.1978); *In re Tonry*, 724 F.2d 467 (5th Cir.1984); V. Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973)) ("The Fifth Circuit Court of Appeals … applies the 'Countryman definition.' [that states that an executory contract is a] contract under which the obligation of both the bankrupt and the other party are so far unperformed

20. To the extent that the Lendteq/DES Agreement is an executory contract—which it is not—the cost of curing the Debtors' defaults are far from zero. Indeed, Lendteq has suffered damages for no less than $501,216.30 as a result of the Debtors' failure to perform.[35] And, given the lapse in term, the Debtors' failure to perform may very well be incurable.[36]

C. **The Proposed Sale Fails to Specifically Exclude Lendteq's Property.**

21. Lendteq previously filed its Limited Objection [Dkt. No. 318] regarding the scope of the Sale and Lendteq's concerns that the Debtors may attempt to "sell" Lendteq's property.[37] To this end, while the Proposed Order includes language seeking to limit the definition of "Acquired Assets," such definition remains overly-broad and confusing, which adds ambiguity to the Sale.[38]

22. At the January 12th Status Conference, Judge Brown directed Lendteq and the Debtors to enter into a joint stipulation stating that the equipment purchased by Lendteq does not belong to the Debtors and, thus, is not part of the proposed Sale. As of the filing of this Objection, Lendteq and the Debtors are in discussions regarding the joint stipulation and hope to

---

that the failure of either to complete performance would constitute a material breach excusing the performance of the other.").

[35] *See* Case No. 15-34736, Proof of Claim No. 42 (Lendteq's proof of claim); Case No. 15-34738, Proof of Claim No. 79 (Lendteq's proof of claim) (collectively and as previously defined, Lendteq's "Proofs of Claim"). As previously stated, the descriptions contained in the Proofs of Claim are hereby incorporated herein by reference as such descriptions are applicable.

[36] *See In re Escarent Entities, L.P.*, 423 F. App'x 462, 465 (5th Cir. 2011) (holding that debtor is precluded from assuming an executory contract that is subject to an incurable default).

[37] Lendteq hereby incorporates by reference its Limited Objection to the extent that the concerns raised therein are not addressed prior to the Sale hearing.

[38] *See* APA at 3 §1.1 ("The term 'Acquired Assets' means all of the Sellers' business, assets, properties, contractual rights, goodwill, going concern value, rights and claims used or held for use in their respective business (other than Excluded Assets), including the Diverse Acquired Assets, ITS Acquired Assets and Rouly Acquired Assets. ***For the avoidance of doubt, while specific assets of Diverse, ITS and Rouly are itemized below, (a) such listing is not exclusive and is for illustrative purposes only*** and (b) all Acquired Assets held by Diverse Texas, Scribner, ITS Water and Acquisition Financing Group, if any will also be Conveyed to Purchaser (or its designated affiliate) at the Closing. For the avoidance of doubt, Sellers will not be deemed to have transferred any assets that are not otherwise owned by Sellers …." (emphasis added)).

have the joint stipulation filed prior to the January 19th hearing.  However, Lendteq hereby incorporates by reference its Limited Objection (out of an abundance of caution) to the extent that the concerns raised in the Limited Objection are not resolved prior to the Sale hearing.[39]

## IV. CONCLUSION

WHEREFORE, Lendteq respectfully requests that the Court DENY the Debtors' Sale Motion and grant Lendteq such other relief to which it is entitled at law or in equity.

Dated:  January 19, 2016

                                          Respectfully submitted,

                                          By: */s/ Joseph E. Bain*

                                          Floyd R. Hartley, Jr. (Bar No. 00798242)
                                          ALLRED WILCOX & HARTLEY PLLC
                                          1022 E. 15th St.
                                          Plano, Texas 75074
                                          Email: frhartley@awh-pllc.com
                                          Telephone: 214.224.0888
                                          Facsimile: 214.224.0888

                                          - And -

                                          Kate H. Easterling (Bar No. 24053257)
                                          Joseph E. Bain (Bar No. 24085187)
                                          EDISON, MCDOWELL & HETHERINGTON LLP
                                          Phoenix Tower
                                          3200 Southwest Freeway, Suite 2100
                                          Houston, Texas 77027
                                          Email:  kate.easterling@emhllp.com;
                                                     joe.bain@emhllp.com
                                          Telephone:  713.337.5580
                                          Facsimile:  713.337.8850

                                          **COUNSEL TO LENDTEQ, LLC**

---

[39] In addition to the stipulation, Lendteq respectfully submits that, if the Sale is permitted to go forward, Lendteq's property should be included in the definition of "Excluded Assets" to further avoid ambiguity. *See* APA at 6-7.

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing was served on those parties entitled to notice via this Court's ECF system and upon the parties mentioned below by electronic mail on this 19th day of January, 2016.

J. Robert Forshey
Forshey Prostok LLP
777 Main Street, Suite 1290
Fort Worth, Texas 76102
bforshey@forsheyprostok.com
**Counsel to the Debtors**

Michael W. Bishop
Gray Reed & McGraw, P.C.
1601 Elm Street, Suite 4600
Dallas, Texas 75201
mbishop@grayreed.com
**Counsel to ITS Engineered Systems, Inc.**

R. Scott Cohen
Michael Considine
Jones Day
2727 North Harwood Street
Dallas, Texas 75201
scohen@jonesday.com
mpconsidine@jonesday.com
**Counsel to the Potential Purchasers**

H. Miles Cohn
Crain, Caton & James, PC
1401 McKinney, 17th Floor
Houston, TX 77010
mcohn@craincaton.com
**Counsel to the Official Committee of Unsecured Creditors of ITS Engineered Systems, Inc.**

Ellen M. Hickman
Office of the U.S. Trustee
515 Rusk Street, Suite 3516
Houston, TX 77002
ellen.hickman@usdoj.gov
**Office of the United States Trustee**

*/s/ Joseph E. Bain*
Joseph E. Bain